**Josephina DUCHESNE as Administratrix of the Estate of Pauline Perez et al., Plaintiffs-Appellants,**

v.

**Jule M. SUGARMAN et al., Defendants-Appellees.**

**No. 894, Docket 76–7475.**

United States Court of Appeals, Second Circuit.

Argued May 2, 1977.

Decided Sept. 28, 1977.

As Amended on Denial of Rehearing Nov. 8, 1977.

Lisa H. Blitman, New York City, for plaintiffs-appellants.

Frederick J. Magovern, New York City (Bodell & Magovern, New York City), for defendants-appellees The New York Foundling Hospital and St. Joseph's Home of Peekskill.

L. Kevin Sheridan, New York City (W. Bernard Richland, Corp. Counsel, New York City), for Municipal Official defendants-appellees.

Before WATERMAN and GURFEIN, Circuit Judges, and BLUMENFELD, District Judge.*

BLUMENFELD, District Judge:

This is a civil rights action brought pursuant to 42 U.S.C. § 1983 seeking money damages. The gravamen of the claim is the allegedly unlawful and unconstitutional assumption and retention of the custody of two minor children without their mother's consent and without benefit of a hearing or court order. The action was initiated in August 1972 by Pauline Perez on behalf of herself and her two minor children. Named as defendants were four supervisory-level municipal welfare employees and two private child-caring institutions.

A jury trial was commenced in the United States District Court for the Southern District of New York, Charles M. Metzner, *Judge,* on April 21, 1976. Following plaintiffs' case, the district court dismissed the complaint against the individual defendants, and at the completion of all the evidence, it dismissed counts 1 and 2 of the complaint against the institutional defendants.[1]

The present appeal is taken from these two orders of dismissal. Appellants are Josephina Duchesne, as administratrix of the estate of Pauline Perez,[2] and the two minor children, Danny and Marisol. Appellees are Jule M. Sugarman, former Commissioner of New York City's Human Resources Administration, Elizabeth Beine, former Director of Child Welfare Services in New York City's Bureau of Child Welfare, Seymour Fass, former Director of New York City's Bureau of Child Welfare, Manhattan Section,[3] and the two private

---

* Senior United States District Judge for the District of Connecticut sitting by designation.

1. Plaintiffs' complaint alleged five counts. Counts 1 and 2 (which are the concern of this appeal) alleged due process violations by defendants in refusing to return the children to their natural mother without a hearing. Count 3 asserted an equal protection claim which was dismissed earlier in the case; this court affirmed that dismissal. *Perez v. Sugarman,* 499 F.2d 761, 763 n.1 (2d Cir. 1974). Count 5, which alleged a claim of false imprisonment, has been abandoned by plaintiffs. Count 4 charged the institutional defendants with the tort of intentional infliction of emotional distress. This claim was submitted to the jury, and verdicts were returned for defendants. No appeals have been taken from these verdicts.

2. Ms. Pauline Perez, mother of the two children, died several months prior to trial; appellant Josephina Duchesne is her mother. It is well-settled that pursuant to 42 U.S.C. § 1988 state survival statutes are applicable to civil rights actions brought under 42 U.S.C. § 1983. *Moor v. County of Alameda,* 411 U.S. 693, 702–03 n.14, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); *Brazier v. Cherry,* 293 F.2d 401 (5th Cir. 1961); *Perkins v. Salafia,* 338 F.Supp. 1325, 1326–27 (D.Conn.1972). While the issue has not been raised nor briefed on appeal, it appears that under New York law Ms. Perez's claims for compensatory and nominal damages survive. N. Y. Est., Powers and Trusts Law, § 11–3.2(b) (McKinneys 1976). Only the claim for punitive damages does not survive. Of course, all claims of the children are unaffected by Ms. Perez's death.

3. The original complaint also named as a defendant James Princeler, a Bureau of Child Welfare caseworker. While the record is extremely confused on this point, it appears that the trial court dismissed the action against him because of plaintiffs' failure to prosecute. Docket Sheet, entry for December 4, 1975. On December 12, 1975, a Notice of Appeal from this dismissal was filed. However, the failure to forward to the clerk of this court the necessary documents resulted in a dismissal of the appeal without it ever being docketed. It seems that an "additional summons" was served on Princeler on December 31, 1975. Docket Sheet, entry for January 6, 1976. Al-

child-caring institutions, the New York Foundling Hospital and St. Joseph's Home for Children.[4]

In reviewing the propriety of the district court's orders of dismissal which directed verdicts for the appellees, several steps of analysis must be performed. First, it is necessary to determine whether the appellants' due process rights have been violated. Second, if there has been a constitutional violation, inquiry must be made as to which, if any, of the appellees may be held liable under § 1983 for money damages. Our review reveals that there has been a due process violation and that the jury should have been permitted to decide whether any of the appellees must answer in damages. Therefore, we reverse and remand for a new trial on the issues of liability and damages.

## I. Facts

The salient facts may be summarized as follows.[5] On December 16, 1969, Pauline Perez decided that she needed medical attention for emotional problems which had been disturbing her. Before going to Bellevue Hospital, Perez left her two children, Danny, age 7, and Marisol, age 6 months, with a neighbor with whom she had shared baby-sitting responsibilities. Perez expected that she would receive out-patient care at Bellevue and would return to her children the same day. Instead, she was admitted to the hospital where she remained for the next six days. Meanwhile, the neighbor with whom the children were left contacted the police and informed them that she could not care for the children for more than a night because she was about to give birth to a child of her own. The police relayed this information to a welfare center, which in turn contacted New York City's Bureau of Child Welfare ("B.C.W.").

On December 17, 1969, a B.C.W. representative visited Perez in the hospital and attempted to have her sign a form granting consent to the Bureau to obtain custody. The B.C.W. records indicate that the representative explained to Perez "that she would not lose any rights as mother and that as soon as she came out of the hospital, she could have the children back when she was able to provide proper care."[6] Despite these assurances, Perez refused to sign. The B.C.W. employee reported this refusal to his supervisor, caseworker James Princeler. Princeler advised the caseworker that no consent was necessary at that point.[7]

On that same day, the Bureau assumed custody of the two children; Danny was placed in the St. Joseph's Home for Children and Marisol in the New York Foundling Hospital. The records of the Bureau and the two institutions indicate that the emergency placements were requested by B.C.W. because the children's mother was in

though he testified at trial, nothing in the record indicates whether Princeler was properly restored as a party to this action. Therefore, we assume that the initial dismissal for failure to prosecute was with prejudice and that Princeler is not a party to the present appeal.

4. The two private institutions fall within New York's statutory definition of "authorized agencies" empowered to care for and have custody of children from state and city officials. N. Y. Social Services Law, § 371(10) (McKinneys 1976). In 1974, this court found that these private institutions were acting "under color of state law" and, therefore, reversed the dismissal of the complaint against them. *Perez v. Sugarman*, 499 F.2d 761 (2d Cir. 1974). These appellees now ask us to reconsider the state action question in light of the intervening Supreme Court opinion in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). We have considered the implications of that case, but reaffirm our earlier finding of state action.

5. At this point, it is appropriate to note that review of this case had been made most difficult because of the absence of a trial transcript. Our only glimpse at the actual trial testimony comes second-hand from a "Statement of Evidence" prepared pursuant to Rule 10(c), Fed.R. App.P., which summarizes the evidence. Moreover, it is not clear what the state of the evidence was at the time each verdict was directed, for these verdicts were directed at different stages of the trial. The parties have not provided this court with much assistance in resolving these difficulties.

6. Exhibit 1, Bureau of Child Welfare Records, entry for December 17, 1969 ("Exhibit 1").

7. *Id.*

the hospital. There is no mention of the absence of parental consent nor of the need for procurement of court authorization. Indeed, the procedures followed in obtaining and retaining custody of the children accorded with the directives of the Inter-Agency Manual of Policies and Procedures, which was issued jointly by the Commissioner and the highest officials of the Bureau of Child Welfare.[8] As shall be more fully discussed later, the Manual instructed that children may be separated from their families in emergencies without benefit of parental consent or a court order; no requirement for prompt judicial ratification of such emergency action qualified this mandate.[9]

On December 22, 1969, Perez was released from Bellevue; she immediately contacted a B.C.W. caseworker and demanded that her children be returned. However, the children were not relinquished. Several days later, Perez voluntarily returned to the hospital where she remained until February 1970. Upon her release at that time, requests for return of her children were made of the Bureau and the two institutions; the requests were again rejected. An explanation for these refusals may be found in St. Joseph's conclusion that Perez was " 'sweet,' but 'not mother material.' "[10]

On January 22, 1970, a Deputy Commissioner authorized St. Joseph's to admit Danny to foster care because of the "mental illness of the person caring for the child."[11] A similar authorization for Marisol was received by the Foundling Hospital on March 2, 1970. Thus, the children were no longer in temporary emergency placement, but were to be the subject of planning for long-term, if not necessarily permanent, care.

On April 29, 1970, a psychiatrist who had been treating Ms. Perez recommended that the children be returned to her one at a time. B.C.W. reported the recommendations to the child-caring institutions, but because they objected, the children were not returned.

In succeeding months, Perez repeatedly requested the return of her children; but all of these requests were denied. During this entire time, the children were never able to visit each other. And, in October 1971, the situation reached crisis proportions for Perez when she discovered that Marisol, now two years old, had been transferred to a foster home; no advance notice of this action had been given to her. The mother vehemently complained to various authorities that she had never signed any papers; but her pleas once again fell upon deaf ears.[12]

The records reveal that at least as of November 10, 1971, B.C.W., St. Joseph's and the Foundling Hospital were all aware that Perez had never signed any consent or commitment papers.[13] The three discussed the absence of consent, but decided that they would take no action unless Perez initiated legal proceedings on her own.[14] Indeed, the records reveal that "[s]ince obtaining Pauline's signature at this point seem[ed] an impossibility, [they] agreed not to attempt

---

8. Exhibit 2, Inter-Agency Manual of Policies and Procedures.

9. *Id.,* Section 2, at 6; Section 5, at 14.

10. Exhibit 6, New York Foundling Hospital Case Records, Social Record of the Child, at 15 ("Exhibit 6").

11. Exhibit 5, St. Joseph's Home Case Records, Folder # 1 ("Exhibit 5").

12. Exhibit 6, Social Record of the Child, entry for October 18, 1971.

13. Exhibit 1, entry for November 10, 1971; Exhibit 6, Social Record of the Child, entry for November 10, 1971; Exhibit 5, Folder # 1,

entry for December 27, 1971. It appears that St. Joseph's learned of the mother's refusal to sign a consent form as early as October 28, 1971. Exhibit 6, Social Record of the Child, entry for October 28, 1971. But, St. Joseph's own records make no mention of this fact until an entry for December 27, 1971. In any event, this discrepancy is of no real significance because even after that date in December no immediate action was taken by the institution to procure judicial authorization.

14. Exhibit 1, entry for December 29, 1971; Exhibit 5, Folder # 1, entry for December 29, 1971; Exhibit 6, Social Record of the Child, entry for December 27, 1971.

it."[15] Moreover, the Foundling Hospital's records demonstrate that it informed Perez of her legal right to institute an action if *she* thought the children should be with her.[16]

Finally, on February 22, 1972, some 27 months after the family had been separated, Perez filed a petition in the New York Supreme Court seeking a writ of habeas corpus. Although no effort had been made by appellees to seek judicial authorization of either the initial removal or the continued detention of the children for over two years, they now, 10 days after the filing of Perez's habeas action, filed a neglect proceeding in the New York Family Court. This action was consolidated with Perez's habeas petition for a hearing in the Family Court. The court denied the petition for a writ of habeas corpus, and found Perez guilty of neglect. *In the Matter of Danny C.,* Docket No. N704/06 (Family Ct. New York Cnty. Dec. 1, 1972). However, on appeal the Appellate Division reversed; that court found that the initial removal and continued detention of the children were in violation of state law because of the absence of a court order or Perez's written consent. *In the Matter of Danny C.,* 47 A.D.2d 160, 365 N.Y.S.2d 535 (1st Dep't 1975). Moreover, the court reversed the Family Court's finding of neglect because Perez had been denied the opportunity to present rebuttal evidence. However, it denied the habeas remedy apparently on the basis of a temporary order of the Family Court directing that the status quo be maintained pending the final adjudication of the neglect proceeding.[17]

## II. *Constitutional Deprivation*

The threshold inquiry is whether the evidence establishes that appellants have been deprived of a constitutional right.[18] They assert that the removal and detention of

the children with neither parental consent nor court authorization, and in the face of the mother's repeated requests for their return, deprived them of their right to live together as a family without due process of law. The crux of the claim is that appellees could not constitutionally refuse to return the children to their mother's custody without providing an opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965).

The Supreme Court has established the framework for analyzing a due process claim such as that presented here. The initial determination is whether appellants have been deprived of "interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). If such a deprivation has occurred, the remaining question is "the nature of the process that is due. . . ." *Morrissey v. Brewer,* 408 U.S. 471, 484, 92 S.Ct. 2593, 2602, 33 L.Ed.2d 484 (1972).

### A. *Liberty Interest*

█ It is beyond peradventure that "freedom of personal choice in matters of . . . family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974). The existence of a "private realm of family life which the state cannot enter," *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944), "has its source . . . not in state law, but in intrinsic human rights, as they have been understood in 'this Nation's history and tradition.' " *Moore v. City of East Cleveland,* 431 U.S.

---

**15.** Exhibit 5, Folder # 1, entry for December 27, 1971.

**16.** Exhibit 6, Social Record of the Child, entry for January 13, 1972.

**17.** Reply Brief for Appellants, April 14, 1977, at 10.

**18.** The essential facts upon which the determination of whether there has been a constitutional deprivation turns are undisputed. Therefore, this issue can be decided as a matter of law and need not be considered in the first instance by a jury.

494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977)," *Smith v. Organization of Foster Families for Equality and Reform,* 431 U.S. 816, 845, 97 S.Ct. 2094, 2110–2111, 53 L.Ed. 14 (1977) (*"Organization of Foster Families"*) (footnote omitted).

■ Here we are concerned with the most essential and basic aspect of familial privacy—the right of the family to remain together without the coercive interference of the awesome power of the state. This right to the preservation of family integrity encompasses the reciprocal rights of both parent and children. It is the interest of the parent in the "companionship, care, custody and management of his or her children," *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972), and of the children in not being dislocated from the "emotional attachments that derive from the intimacy of daily association," with the parent, *Organization of Foster Families, supra,* 431 U.S. at 844, 97 S.Ct. at 2110.[19]

This mutual interest in an interdependent relationship has received consistent support in the cases of the Supreme Court.

"The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed 'essential,' *Meyer v. Nebraska,* 262 U.S. 390, 399 [43 S.Ct. 625, 626, 67 L.Ed. 1042] (1923), 'basic civil rights of man,' *Skinner v. Oklahoma,* 316 U.S. 535, 541 [62 S.Ct. 1110, 1113, 86 L.Ed. 1655] (1942), and '[r]ights far more precious . . . than property rights,'

*May v. Anderson,* 345 U.S. 528, 533 [73 S.Ct. 840, 843, 97 L.Ed. 1221] (1953). 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' *Prince v. Massachusetts,* 321 U.S. 158, 166 [64 S.Ct. 438, 442, 88 L.Ed. 645] (1944)."

*Stanley v. Illinois, supra,* 405 U.S. at 651, 92 S.Ct. at 1212–13. *See also, Armstrong v. Manzo, supra.*

■ While there may be some doubt as to the precise definition of the "family," *see, e. g., Organization of Foster Families, supra,* 431 U.S. at 816, 97 S.Ct. 2094, there can be no question that the liberty interest in family privacy extends to a mother and her natural offspring, as are involved in this case. Nor can there be any question that appellants were deprived of their right to live together as a family by the refusal to return the children to the custody of the mother. Thus, we must determine whether this deprivation of the liberty interest in family privacy was accompanied by adequate process.

### B. *The Process that is Due*

■ While deprivation of a liberty interest triggers the protection of the fourteenth amendment, the determination of what process is due still remains. The trial court concluded that "[t]he initial custody in December 1969 was clearly proper since the facts show an emergency situation with

---

19. "The right to family privacy and parental autonomy, as well as the reciprocal liberty interest of parent and child in the familial bond between them, need no greater justification than that they comport with each state's fundamental constitutional commitment to individual freedom and human dignity. But the right of parents to raise their children as they think best, free of coercive intervention, comports as well with each child's biological and psychological need for unthreatened and unbroken continuity of care by his parents. No other animal is for so long a time after birth in so helpless a state that its survival depends upon continuous nurture by an adult. Although breaking or weakening the ties to the responsible and

responsive adults may have different consequences for children of different ages, there is little doubt that such breaches in the familial bond will be detrimental to a child's well-being. But 'so long as a family is intact, the young child feels parental authority is lodged in a unified body which is a safe and reliable guide for later identification.' Court or agency intervention without regard to or over the objection of parents can only serve to undermine the familial bond which is vital to a child's sense of becoming and being an adult in his own right."

Goldstein, *Medical Care for the Child at Risk: On State Supervention of Parental Autonomy,* 86 Yale L.J. 645, 649–50 (1977) (footnotes omitted).

the mother in the psychiatric ward of Bellevue Hospital and no one to take care of the children." Appendix, at 44. We agree that the evidence establishes that the taking of the children was justified at the outset by an emergency. As such, as a matter of constitutional law, the initial removal of the children without parental consent or a *prior* court order was permissible. *Cf. Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594, 599, 70 S.Ct. 870, 94 L.Ed. 1088 (1950). However, in those "extraordinary situations" where deprivation of a protected interest is permitted without prior process, the constitutional requirements of notice and an opportunity to be heard are not eliminated, but merely postponed. *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).

It is admitted that appellees did not obtain judicial authorization to retain custody until December 1972, some 36 months after their initial emergency action, and that this authorization was sought only after Perez had instituted a habeas corpus proceeding in February 1972. Moreover, the evidence is clear that this failure to act was in the face of repeated requests by the mother for the return of her children. Yet, both the trial court and appellees argue that this failure to seek prompt judicial ratification of emergency action was not constitutionally defective because the state remedy of habeas corpus was always available to appellants. It is asserted that this remedy provided an opportunity for an adequate hearing. In support of this position, the trial court and appellees rely on this court's *per curiam* affirmance of then district court Judge Mansfield's opinion in *Boone v. Wyman,* 295 F.Supp. 1143 (S.D.N.Y.), aff'd, 412 F.2d 857 (2d Cir. 1969), *cert. denied,* 396 U.S. 1024, 90 S.Ct. 600, 24 L.Ed.2d 518 (1970). However, there are important distinctions between the circumstances of this case and those involved in *Boone*—distinctions which mandate the conclusion that the existence of a habeas remedy did not afford these appellants with an opportunity to be heard "at a meaningful time and in a meaningful manner."

*Boone v. Wyman* involved a challenge to what was then § 383 of the New York Social Services law; the statute provided that once a child was remanded or committed to an authorized agency, the parent was not entitled to custody without the consent of the proper authority or a court order.[20] Two separate plaintiffs challenged this provision. The original plaintiff, Boone, was the 17-year-old father of an illegitimate child. The mother of the child, who had custody, voluntarily placed the child in the care of the Commissioner of Social Services of the City of New York pursuant to a written instrument executed by her. "The agreement was entered into by the mother voluntarily and with full knowledge of the nature and legal consequences of the instrument." 295 F.Supp. at 1146. Boone claimed that he was being deprived of his right to custody because the Department of Social Services would not release the child to him upon request.

The intervening plaintiff, Gonzalez, was the 18-year-old unwed mother of a child. She had executed an authorization similar to that signed by the mother of Boone's child. She claimed that her consent was involuntarily induced and that her right to custody was also being denied by the refusal to return her child to her.

Plaintiffs argued that § 383 deprived them of procedural due process by permitting officials to deny natural parents' requests for custody without holding a hearing or instituting judicial proceedings. Judge Mansfield held, and this court af-

---

**20.** "Section 383 provide[d] in [relevant] part that:

'The parent of a child remanded or committed to an authorized agency shall not be entitled to the custody thereof, except upon consent of the court, public board, commission or official responsible for the commitment of such child, or in pursuance of an order of a court or judicial officer of competent jurisdiction, determining that the interest of such child will be promoted thereby and that such parent is fit, competent and able to duly maintain, support and educate such child.' "

*Boone v. Wyman,* 295 F.Supp. 1143, 1147 (S.D. N.Y.1969).

firmed *per curiam,* that the statute was not unconstitutional because state law furnished a habeas remedy providing for a *de novo* hearing in which the state had the burden of establishing the parent's unfitness. In the circumstances of that case, it was felt that this habeas remedy provided adequate process.

■ Initially, it must be noted, that unlike the plaintiffs in *Boone,* the present appellants do not challenge the constitutionality of any state statute. Rather, they assert that the appellees have violated state law,[21] as well as the Constitution. In a footnote to an earlier opinion in this case, this court intimated that while the relevant state law possibly permitted emergency placements without parental consent or a prior court order, it clearly required the official to " 'promptly inform the parent . . . and the family court of his action.' (Emphasis supplied). NYSSL § 398, subd. 9." *Perez v. Sugarman,* 499 F.2d 761, 763–64 n. 3 (2d Cir. 1974). The highest state court to review the case has concurred in this conclusion, finding that the initial removal and the continued detention of the children were in violation of state law "since initially there was no court order obtained and neither did she give her written consent to the removal and detention of her children, nor was a petition timely made to a court as required." *In the Matter of Danny C., supra,* 47 A.D.2d at 163, 365 N.Y.S.2d at 537.[22] Of course, this apparent violation of state law is not necessarily a basis for a § 1983 claim; there must also be a constitutional deprivation. *Rosenberg v.*

*Martin,* 478 F.2d 520, 524 (2d Cir.), *cert. denied,* 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973); *see also, Paul v. Davis,* 424 U.S. 693, 699–701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

The critical distinction,[23] and one of constitutional significance, between the present case and *Boone v. Wyman* is the manner in which custody was initially obtained. In *Boone,* custody was authorized at the outset by written parental consent; here, there was no parental consent, and, indeed, there was an explicit refusal to sign a consent form. In *Boone,* the state initially deprived the family of their right to live together only with the approval of a parent. While there may have been later challenges to the consent, the family relationship was not severed solely on the basis of the state's *ex parte* assessment of the family situation. In the present case, the initial physical removal of the children during an emergency, while constitutionally permissible, was without explicit parental consent. This action and the continued separation of the family by retention of custody was based on a unilateral and untested evaluation of the mother's fitness as a parent. As Justice Stewart has very recently stated:

"If a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest, I should have little doubt that the

---

**21.** Appellants' complaint alleges pendent state law claims. We do not pass on whether the apparent violations of state law give rise to claims for money damages. This is for consideration in the first instance by the trial court.

**22.** The trial court found that the children were to be classified as "destitute" rather than "neglected" for purposes of New York law. The import of this conclusion is not readily apparent, but it seems that it would call into play different state procedures. Of course, from a constitutional perspective, this is irrelevant; the concern is only with what procedures were in fact pursued. In any event, it ill-behooves appellees to argue that the children should be classified as "destitute" in light of their claim,

consistently asserted both in the state courts and in this case, that the children were "neglected."

**23.** Another important distinction between the present case and *Boone v. Wyman* should be noted. A significant portion of Judge Mansfield's opinion in *Boone* focuses on the custody battle between Boone and the mother of the child. The opinion quite properly emphasizes the reluctance of a federal court to interfere with custody decisions which traditionally have been within the exclusive province of the state courts. We are not dealing here with a custody battle between parents, but rather with one between a parent and the state.

State would have intruded impermissibly on 'the private realm of family life which the state cannot enter.' *Prince v. Massachusetts,* 328 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645."

*Organization of Foster Families, supra,* 431 U.S. at 862, 97 S.Ct. at 2119 (Stewart, J., concurring).[24]

In this situation, the state cannot constitutionally "sit back and wait" for the parent to institute judicial proceedings. It "cannot . . . [adopt] for itself an attitude of 'if you don't like it, sue.'" *Kimbrough v. O'Neil,* 523 F.2d 1057, 1060 n. 3 (7th Cir. 1975) (Swygert, J., concurring). The burden of initiating judicial review must be shouldered by the government. We deal here with an uneven situation in which the government has a far greater familiarity with the legal procedures available for testing its action. In such a case, the state cannot be allowed to take action depriving individuals of a most basic and essential liberty interest which those unedu-

cated and uninformed in legal intricacies may allow to go unchallenged for a long period of time. *Cf. Fuentes v. Shevin,* 407 U.S. 67, 83 n. 13, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Hernandez v. European Auto Collision, Inc.,* 487 F.2d 378, 385 n. 4 (2d Cir. 1973) (Timbers, J., concurring). Nowhere is the inadequacy of the state's approach more poignantly demonstrated than in the present case where the mother did not obtain legal advice until May 1971[25] and did not institute a habeas proceeding until February 1972. Until that time, some 27 months after the initial removal of the children, her rights and those of her children to live together as a family were denied with impunity. Therefore, we must conclude that the failure of appellees to obtain judicial ratification of their decision to maintain custody of the children, despite the numerous and vociferous requests of Ms. Perez for their return, constituted a violation of due process.[26]

---

**24.** In many ways, the situation involved here is not unlike that presented to the Supreme Court in *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). In that case, the Court held unconstitutional a Florida procedure which permitted a person arrested on the basis of a prosecutor's warrant to be held for trial without a judicial determination of probable cause. The Court recognized that the practicalities of on-the-street situations often require arrests before there can be a judicial determination of probable cause. "Once the suspect is in custody, however, the reasons that justify dispensing with the magistrate's neutral judgment evaporate." *Id.* at 114, 95 S.Ct. at 863.

While the concern in *Gerstein v. Pugh* was with the fourth amendment, as incorporated into the fourteenth, there is a striking analogy here where children are initially removed from their parent in an emergency and the state seeks to maintain custody without taking steps to procure prompt judicial intervention by an impartial state judicial officer. Of course, the deprivation of liberty involved here was purportedly based on the "best interests" of the children and hence is not precisely akin to that caused by an arrest. Nevertheless, "[o]f all tyrannies a tyranny sincerely exercised for the good of its victims may be the most oppressive . . . . [T]hose who torment us for our own good will torment us without end for they do so with the approval of their own conscience." Goldstein, *supra* note 19, at 645, *quoting,* Lewis, *The Humanitarian Theory of Punishment,* 6 Res Judicatae 224, 228 (1952).

**25.** Brief for Appellees, March 31, 1977, at 9.

**26.** Our conclusion that the availability of habeas corpus in the state courts does not provide adequate process is buttressed by consideration of the three factors articulated in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) for the purposes of identifying the specific dictates of due process:

"first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Id.* at 335, 96 S.Ct. at 903.

We have discussed the very great importance of the private liberty interest involved here. As the Court said in *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972), "It is plain that the interest of a parent in the companionship, care, custody and management of his or her child 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.' *Kovacs v. Cooper,* 336 U.S. 77, 95 [69 S.Ct. 448, 458, 93 L.Ed. 513] (1949) (Frankfurter, J., concurring)." Secondly, the "fact specific" nature of the determination of the fitness of a parent

### III. *Appellees' Liability*

Title 42 U.S.C. § 1983 establishes a federal cause of action for damages against state and local officials who have caused individuals to suffer a constitutional deprivation,[27] and was designed to protect them against a "[m]isuse of power . . . made possible only because the wrongdoer is clothed with the authority of state law . . . ." *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941). Having determined that appellants have suffered from such constitutional deprivations, the remaining question is which, if any, of the appellees may be required to compensate them in money damages. The trial court directed verdicts for the municipal officials after plaintiffs' case and for the institutions after all the evidence was submitted. The test to be applied when a motion to direct a verdict has been granted is as follows:

> "The motion [should] be granted only if (1) there is a complete absence of probative evidence to support a verdict for the non-movant or (2) the evidence is so strongly and overwhelmingly in favor of the movant that reasonable and fair minded men in the exercise of impartial judgment would not arrive at a verdict against him. 5 J. Moore, Federal Practice, ¶ 50; 2[1] (2d ed.)"

*Armstrong v. Commerce Tankers Corp.,* 423 F.2d 957, 959 (2d Cir.), *cert. denied,* 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970). For the reasons discussed below, neither of these tests has been satisfied here; it was error to direct verdicts for either set of appellees.

### A. *Institutional Appellees*

The trial court directed verdicts for the New York Foundling Hospital and the St. Joseph's Home for Children because it concluded that there had been no constitutional infraction. As such, it "never reach[ed] the question of whether the defendants here are entitled to the qualified immunity referred to in *Wood v. Strickland,* [420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)]." Appendix, at 44. Since we have concluded that there was a violation of appellants' due process rights, we must consider what, if any, defenses are available to these institutional appellees.[28]

Although not precisely delineated, the institutions assert two interrelated defenses. First, they argue that they cannot be liable because they received authorizations to admit the children from municipal officials. In essence, the contention is that while they are agents of the city authorities for purposes of accepting custody, they are not agents for purposes of law enforcement. For this reason, they claim a right to rely on the city authorities to insure that their custody was lawful. Secondly, they contend that they are entitled to the "qualified immunity/good faith" defense articulated in *Wood v. Strickland, supra.*

Both these defenses present questions which cannot be resolved as a matter

---

presents a grave risk of erroneous deprivation when the action of the state is not promptly reviewed. Indeed, in the present case, the custody of the children was withheld from Ms. Perez despite the view of her psychiatrist that she was capable of caring for them. Finally, the administrative and fiscal burden to the state can be of no moment when state law itself apparently requires a court order and prompt judicial review of emergency action.

27. Title 42 U.S.C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

28. Although not squarely raised by the parties, in the interest of clarity we point out that the doctrine of res judicata is inapplicable to the present case. In state court, appellants did not raise the federal constitutional claims which are the basis of this § 1983 action. The state proceedings were concerned mainly with the merits of the state's claims regarding the fitness of Ms. Perez as a mother, not with whether she was afforded due process as required by the fourteenth amendment. *Lombard v. Board of Education of The City of New York,* 502 F.2d 631 (2d Cir. 1974), *cert. denied,* 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975).

of law; therefore they must be tendered to the jury on remand.[29] The evidence establishes that each of the institutions became aware that their custody was based neither on parental consent nor on a court order. As such, it is for the jury to determine whether they did in fact rely on the city authorities and whether they acted in good faith as that defense has been defined by the Supreme Court in *Wood v. Strickland*.[30] *Cf. Shifrin v. Wilson*, 412 F.Supp. 1282, 1295–96 (D.D.C.1976).

### B. *Individual Appellees*

The directed verdicts in favor of the second group of appellees present a troublesome problem. Each individual appellee was at the relevant time a supervisory-level municipal welfare officer; Sugarman was Commissioner of the City's Human Resources Administration; Beine was the Director of Child Welfare Services in New York City's Bureau of Child Welfare; and Fass was Director of the City's Bureau of Child Welfare, Manhattan Section. Each of these appellees has been sued *individually,* as well as in his or her official capacity. *Compare Monell v. Department of Social Services*, 532 F.2d 259 (2d Cir. 1976), *cert. granted*, 429 U.S. 1071, 97 S.Ct. 807, 50 L.Ed.2d 789 (1977).

The doctrine of *respondeat superior* is unavailable as a basis for imposing liability under § 1983; there must be some showing of *personal responsibility. Arroyo v. Schaefer*, 548 F.2d 47, 51 (2d Cir. 1977); *Williams v. Vincent*, 508 F.2d 541, 546 (2d Cir. 1974); *Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir. 1973). The trial court concluded that appellants failed to establish the necessary personal responsibility because there was no showing that any of these appellees personally knew of appellants nor personally took any action with respect to them.

However, the evidence reveals that various portions of the Inter-Agency Manual of Policies and Procedures issued jointly by the Commissioner and the highest officials of the Bureau of Child Welfare contained directives that sanctioned the type of action which resulted in the constitutional deprivations. In the section of the Manual dealing with "intake" procedures, there is a discussion of the need for the consent of parents or guardians for placement. A portion of that discussion reads:

> "The consent of a parent who is in a hospital for the mentally ill, an institution for mentally defectives or in a prison is not required. It is, however, the general policy of BCW to try to obtain the consent of such parent whenever it is considered desirable on the basis of the case circumstances and the opinion of the director of the hospital, institution or prison."

Exhibit 2, Section 2, at 6. Similarly, a provision dealing with emergency placements states:

> "Whenever it appears that a child is in immediate need of placement (e. g. because he is actually homeless or his wellbeing would be endangered if continued in his present situation) he may be placed by BCW before completion of the required investigation. In such cases, the placement may be made although the person to give consent is not immediately available."

Exhibit 2, Section 5, at 14.

These portions of the Manual properly directed that children may be separated from their families in emergencies without parental consent or a court order. However, they did not contain the qualification, apparently required by state law, and surely required by the Constitution, that all emergency removals must be promptly ratified by court order. That the Manual reflected the thinking of the relevant policy makers is revealed by their own testimony. Appellee Beine testified

---

**29.** Since there are no individual employees of the institutions who are named as defendants, the question for the jury is the corporate responsibility of the institutions. *Perez v. Sugarman*, 499 F.2d 761, 765 n. 5 (2d Cir. 1974).

**30.** *See* pp. 831–832 *infra.*

"[t]hat to her knowledge emergency placements which occur in the absence of a court order or a written consent can continue indefinitely until BCW deems that the emergency no longer exists. That BCW is authorized to continue a placement so long as it judges that placement is in the best interest of the child, regardless of whether there is a court order or written consent.

". . . .

"That the Manual does not set forth specific follow-up procedures to be taken where custody of a child is assumed without either written parental consent or a court order, although it was BCW policy and practice to obtain parental consent whenever possible or seek a court authorization when appropriate. BCW assumed custody of the children where there was a written parental consent, or where there was a court order authorizing placement or where, in the absence of either written consent or court order, it was BCW's judgment that the welfare and best interests of the child required that custody be assumed."

Statement of Evidence, Testimony of Elizabeth Beine, ¶¶ 15, 17. *Accord, id.,* Testimony of Seymour Fass, ¶¶ 3, 4, 6, 8.

In *Rizzo v. Goode,* 423 U.S. 362, 370–71, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976), the Supreme Court emphasized that § 1983 permits the imposition of liability "only for conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution [and laws]." In the circumstances of that case, the Court held that no liability under § 1983 could be imposed on supervisory personnel because

"[a]s the facts developed, there was no affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by petitioners—express or otherwise—showing their authorization or approval of such misconduct."

*Id.* at 371, 96 S.Ct. at 604. It was the absence of this "causal connection" which proved fatal to plaintiff's action in *Rizzo*;

the mere failure to adequately supervise was not enough.

■■■ Unlike *Rizzo,* in the present case, a jury *could find* the individual appellees liable, not on the theory that these supervisory officials may be held responsible for the acts of agents which were negligent or contrary to instructions, but rather on the theory that it was the appellees *own* conduct which resulted in the constitutional violations. It is not necessary for § 1983 liability that the appellees directed any particular action with respect to these specific individuals, only that they *affirmatively* promoted a policy which sanctioned the type of action which caused the violations. In short this is not a case of indifference, that is, a failure to act in the face of misconduct by subordinates, but is rather a case of affirmative policy-making which may have caused the misconduct. *Cf. Allee v. Medrano,* 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); *Hague v. CIO,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

■■■■ A § 1983 plaintiff's burden does not vary depending upon whether he is seeking injunctive or monetary relief; the elements of the cause of action remain precisely the same. In both instances he must prove that the defendant caused him to be subjected to a deprivation of constitutional rights. But, no greater burden is imposed on the plaintiff seeking money damages. The requested relief becomes relevant only in terms of whether or not the defendant is entitled to assert good faith as a defense. (The defense is, of course, only available when money damages are being sought).

In *Rizzo,* the Court found that the plaintiffs had not met their burden of proof because they failed to establish that any acts of the defendants *caused* the constitutional deprivation. This failure to prove causation would have been fatal regardless of whether plaintiffs were seeking monetary or injunctive relief. In *Rizzo* the Court stated:

"The plain words of the statute impose liability—*whether in the form of payment of redressive damages or being placed under an injunction*—only for

conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws."

423 U.S. at 370–71, 96 S.Ct. at 604 (emphasis added).

 Where conduct of the supervisory authority is directly related to the denial of a constitutional right it is not to be distinguished, as a matter of causation, upon whether it was action or inaction. *Cf. Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961):

> "[N]o State may effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be. It is of no consolation to an individual denied the equal protection of the laws that it was done in good faith. . . . By its inaction, the Authority, and through it the State, has not only made itself a party to the refusal of service, but has elected to place its power, property and prestige behind the admitted discrimination."

Title 42 U.S.C. § 1983 does not permit even supervisory personnel to perform their duties in a way that causes constitutional deprivations without requiring them to answer in money damages.

 What we have said only requires that this theory of liability be permitted to go to the jury.[31] The jury must determine whether the Manual directives of policy and procedure, which provided for the taking of custody of children in emergencies without making the necessary qualification for prompt judicial ratification,

were the proximate cause of the constitutional deprivations suffered by appellants. While it may be difficult for appellants to convince the jury that these appellees "played a significant role in causing" the situation which resulted in detention of the children, the evidence is sufficient for such a finding. *Cf. Kletschka v. Driver,* 411 F.2d 436, 447 (2d Cir. 1969). If it finds this "causal connection," the jury must then decide if these appellees' are entitled to the "qualified immunity/good faith" defense. The "qualified immunity/good faith" defense contains both subjective and objective components. *Wood v. Strickland,* 420 U.S. 308, 321, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). It is not enough that appellees may have acted "sincerely and with a belief that [they were] doing right," for "an act violating . . . constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law . . . than by the presence of actual malice." *Id.* Thus, appellees "must be held to a standard of conduct based not only on permissible intentions, but also on knowledge of the basic, unquestioned constitutional rights of [their] charges." *Id.* at 322, 95 S.Ct. at 1001. The necessity of satisfying both elements of the good faith defense is reflected in the test established by the Supreme Court:

> "[T]he relevant question for the jury is whether [appellees] 'knew or reasonably should have known that the action [they] took within [their] sphere of official responsibility would violate the constitutional rights of [the appellants], or if [they] took the action with the malicious

---

31. Appellants assert a second theory for holding these individuals liable. They contend that under state law, appellee Sugarman, as Commissioner, and the others by delegation, had certain statutory duties which make them ultimately responsible for the action taken by their subordinates. *See, e. g.,* New York Social Services Law, § 398 (McKinney's 1976). In support of their position that the breach of such a statutory duty, without more, is an adequate basis for § 1983 liability, they rely on *United States ex rel. Larkins v. Oswald,* 510 F.2d 583 (2d Cir. 1975); *Wright v. McMann,* 460 F.2d 126 (2d Cir. 1972). In both of these cases, however, there was at least some evi-

dence that the defendants personally knew of the violations. Moreover, there were more direct statutory bases for concluding that the defendants should have known of the violations. We are reluctant to stretch the logic of these cases to cover the situation presented to us by the present record since there is no basis for concluding that the officials knew or should have known of the conduct taken with respect to these children. However, we do not absolutely preclude this theory if appellants can point on retrial to specific provisions of state and local law which make reasonable a conclusion that the appellees should have known of the specific conduct involved in this case.

intention to cause a deprivation of constitutional rights or other injury to [the appellants].' [*Wood v. Strickland,* 420 U.S. at 322, 95 S.Ct. 992]."

*O'Connor v. Donaldson,* 422 U.S. 563, 577, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975).

Therefore, with respect to each set of appellees the question is not only whether they acted with good intentions, but also whether they had "reasonable grounds for the belief formed at the time and in light of all the circumstances" that their conduct was constitutional. *Scheuer v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974). For the institutional appellees the focus must be on their "good faith" *vel non* in refusing to return the children to their mother, despite her repeated demands for their return. With respect to the individual appellees the inquiry must center on their "good faith" in promoting the policies and procedures contained in the Manual.[32] Both the causation question and the issue of good faith present questions of fact which are peculiarly within the jury's province.

### IV. *Conclusion*

The family has been described quite properly as "perhaps the most fundamental social institution of our society." *Trimble v. Gordon,* 430 U.S. 763, 769, 97 S.Ct. 1459, 1464, 52 L.Ed.2d 31 (1977). Ms. Perez and her two children were deprived of their right to live together as a family without due process of law. The Civil Rights Act, 42 U.S.C. § 1983, establishes a cause of action against any person who, acting under color of state law, causes an individual to suffer from a constitutional deprivation. We remand for a new trial in which the jury must determine which, if any, of the appellees are liable under § 1983 for the constitutional deprivations suffered by the appellants. If liability is established, the extent of damages[33] must also be fixed by the jury.

---

**32.** Although we do not comment on the merits of this defense as applied to any of the appellees, the following observation is ·appropriate. In comparing the application of the defense to the two sets of appellees, it is important to recall that while the extent of the good faith defense varies with the "scope of discretion and responsibilities of the office," *Scheuer v. Rhodes,* 416 U.S. 232, 247, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974), high-ranking officials must be held to a greater standard of the knowledge of the law. *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). Moreover, any claim of reliance on *Boone v. Wyman* must be tempered by the distinctions in the facts of the two cases and by the apparent failure of appellees to comply with state law. *O'Connor v. Donaldson,* 422 U.S. 563, 576–77, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).

**33.** Appellants' damage claims are not based solely on the state's severance of the family, which may or may not have been justified, but also on the deprivation resulting from the failure to provide them with their due process rights to a prompt hearing following the state's emergency action. *Cf. Hostrop v. Board of Junior College, District No. 515,* 523 F.2d 569, 579 (7th Cir. 1975), *cert. denied,* 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976).