**Dorothy J. WILLIAMSON, individually and as Administratrix of the Estate of Robert Jay Williamson, deceased, Plaintiff,**

v.

**The CITY OF VIRGINIA BEACH, VIRGINIA, a municipal corporation, and Charles R. Wall, in his official capacity as Chief of Police of the City of Virginia Beach, Virginia, and M. Collins, Sgt. J.C. Moyers, Det. R.W. Pickens, and Det. B.B. Batten, individually and in their official capacities as police officers for the City of Virginia Beach, Virginia, Defendants.**

Civ. A. No. 90–1861–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

March 13, 1992.

Andrew M. Sacks, Michael F. Imprevento, Sacks & Sacks, Norfolk, Va., for plaintiff.

Richard J. Beaver, L. Steven Emmert, Office of the City Atty., Virginia Beach, Va., for defendants.

## OPINION

PRINCE, United States Magistrate Judge.

*Nature and Procedural Posture of Case*

The plaintiff, Dorothy J. Williamson, brings this action both in her individual capacity and as the administratrix of her deceased minor son's estate. In the Second Amended Complaint ("Complaint") she seeks damages on her own behalf and, through the estate, on behalf of her son and his statutory beneficiaries. The defendants are the City of Virginia Beach, its chief of police in his official capacity, and four police officers in their individual and official capacities. The complaint alleges federal causes of action under 42 U.S.C. § 1983 for violations of decedent's constitutional rights causing his death, and the violation of her own constitutional rights. The Complaint also alleges a pendant state law claim. Pursuant to 28 U.S.C. § 636(c), the parties have consented to proceed before a United States Magistrate Judge.

Extensive discovery has been conducted and filed, including depositions of all of the parties, of other fact witnesses and of expert witnesses. All defendants have moved for summary judgment, and affidavits in support of and in opposition to the motion have been filed. The motion is now ready for decision.

### Issues Presented

The Complaint contains five counts:

Count I, against the four police officers ("Officers"), alleges violations of decedent's rights under the Due Process Clause of the Fourteenth Amendment. Specifically, plaintiff alleges that the Officers recruited the decedent, Robert Jay Williamson ("Robbie"), a seventeen year old male, for the purpose of using him "as an informant, cooperating witness, and undercover operative" for vice and narcotics investigations and, in doing so without obtaining parental permission or investigating his background, acted with deliberate indifference or reckless or callous disregard to his rights, resulting in Robbie's suicide. Those actions, it is alleged, were in violation of the duty owed to Robbie because of the special relationship between him and the State.[1]

---

1. The term "State" is used throughout this opinion to refer to the municipal defendants or to state and municipal governments generically.

Plaintiff further claims that, independent of any special relationship, the Officers' conduct violated Robbie's constitutional right to "the child-parent relationship", which includes the right to care and guidance from his mother in making important decisions. Alternatively, plaintiff alleges that the Officers deprived Robbie of his constitutional right "to be free from violations of his physical and emotional integrity, his right to bodily security and integrity, his right to be free from unjustified intrusions on personal security, and his right to personal privacy".

Count II, against the City ("City") and the chief of police ("Chief") in his official capacity, alleges that the Chief and the City established a policy of condoning the unconstitutional use of juveniles as informants in violation of the constitutional rights of the decedent. Count III, also against the municipal defendants, alleges that the unconstitutional conduct of the Officers was undertaken pursuant to a known de facto policy of City and Chief of failure to train police officers with regard to the proper limits of their authority to use juvenile informants.

Count IV alleges that the defendants' conduct violated the constitutional rights of decedent's mother, including her right to be free from the deprivation of the parent-child relationship by the death of decedent, and her right to the care, custody and management of decedent's affairs, including the right to consent or not to the use of decedent as an undercover agent of the police department. Finally, Count V alleges a state law claim under the Virginia Wrongful Death Act.[2]

The defendants have moved for summary judgment on all counts, and assert the defense of qualified immunity to the 1983 claims. The defendant also asserts immunity and various state law defenses to Count V of the Complaint.

### Factual Allegations

Robert Jay Williamson ("Robbie"), a 17-year-old male, lived in Virginia Beach with his mother, Dorothy J. Williamson, his 25-year-old half-brother, Steve Brannon, and his younger brother, David, who was 12 or 13 years old when the events recounted here occurred. Robbie called the Virginia Beach Police Department by telephone on Saturday, November 5, 1988, at 6:45 p.m. His call was put through to the Uniform Division Vice Unit ("vice unit"). Defendant Ronald Pickens ("Pickens"), a member of the vice unit, answered. Robbie told Pickens that he had information about drugs at a certain location in the City, which he identified, and that he wanted to give the information to the police. In response to Pickens' questions, Robbie stated his name and age. The conversation ended shortly thereafter. (Plaintiff's Supplemental Appendix [PSA], Pickens deposition at Bates # 000014 [hereinafter "Pick. 14".].).

The following night, Sunday, November 6th, Pickens and his partner, Defendant Bobby Batten, Jr. ("Batten"), went to Robbie's home and talked to him for several minutes outside. Pickens told Robbie that Pickens would have to talk to Robbie's mother to get permission for Robbie to give them information. Robbie stated that his mother was sick and was sleeping. They talked "a couple more minutes about what type information he could give" before Pickens told Robbie that he would call his mother the following day between 3 and 3:30 p.m. Pickens and Batten both gave their business cards to Robbie and left "because there was nothing I could do at that point." (Pick. 15–16.)

Batten's account of the events of Sunday, November 6th, was essentially the same. Batten added that before they went to the Williamson home, Pickens had recounted for him Robbie's call of the night before. Batten said that Pickens told him that Robbie "wanted to work with the police to assist us as far as some narcotics activity—drug activity—to assist us with some drug activity in the area that [Robbie] lived in." (PSA, Batten deposition [hereinafter "Bat."] at Bates # 000089.)[3]

---

**2.** Va.Code Ann. § 8.01–50 et seq. (Michie 1984).

**3.** Plaintiff's Supplemental Appendix has 734 pages and includes parts of twenty-one deposi-

The next day, Monday, November 7th, at 3:20 p.m., Pickens states that he called the Williamson home, asked to speak to Robbie, and then told him that he was calling to speak to his mother. A "lady" came to the telephone and identified herself as Mrs. Williamson. Pickens identified himself to the woman, who, according to Pickens, said she was Mrs. Williamson and gave her permission for Robbie to work with the police. (Pick. 18, 12). Mrs. Williamson denied that Pickens called her home and spoke to her. (PAS, Williamson deposition [hereinafter "Wmnson."] at Bates # 000419).

After the telephone conversation with the woman who claimed to be Ms. Williamson, Pickens reported to his supervisor, Defendant Sgt. J.C. Moyers ("Sgt. Moyers" or "Moyers"), what had transpired the day before. Sgt. Moyers told him that parental consent was needed and Pickens informed Moyers that he had already spoken to Mrs. Williamson. (Pick. 18.) Pickens then started "my background check ... running [Robbie's] criminal history." About that time, Pickens "ran into Detective [Douglas] Williams," who told Pickens that he had in the past arrested Robbie for robbery. Pickens said that Williams also said that he had used Robbie as an informant with the consent of Mrs. Williamson. (Pick. 18.) Williams confirmed that he spoke to Pickens about Robbie, but he does not recall if it was before or after Robbie's death.

(PAS, Williams deposition ["Wms."] at Bates # 000408–9.) No part of Williams' deposition included in the appendix refers to Williams' use of Robbie as an informant with or without the consent of his mother.

The next disclosed contact between Robbie and the police occurred four days later, during the late evening, on Friday, November 11th. Defendant Michael Collins ("Collins"), a member of the vice unit, was working with Sgt. Moyers that evening. He received a message through his pager of a call. When he returned the call, a male told him that he had information "about some narcotics activity that was taking place over in the Holland Road area." The caller said he was at a Burger King on Holland Road.

Collins and Moyers went to the Burger King. They did not know who they were looking for, but when they drove around the Burger King lot, they spotted a person whom they suspected had made the call. That person, who was Robbie, acknowledged that he had called. Robbie then got into the police car and told Collins and Moyers "extensively" about the details of a drug deal that was about to occur. (PAS, Collins ["Col."] deposition at Bates # 000144–5.) Moyers said that Robbie "described it very much in detail as to who was going where and what they were going to pick up and what they were going to do when they left there." (PAS, Moyers

tions spread between pages 1 to 592 and between pages 628 to 734. The first twenty depositions in the Appendix were Bates-numbered sequentially, but the actual pagination of those depositions as transcribed was rearranged and frequently duplicated and triplicated. For example, page 47 of the Batten deposition is Bates-numbered page 90, while page 48 is Bates-numbered page 121. Page 49 of Batten's deposition is included twice with Bates numbers 117 and 122. Page 52 of Batten's deposition is produced three times and they are Bates-numbered pages 91, 126 and 127. The purpose of this rearrangement and redundancy was to use one page in separate ways to emphasize different facts. All lines of every page are not offered, even though they are readable. The Court has rearranged the depositions in Plaintiff's Supplemental Appendix so that they are in their original order of pagination insofar as those pages have been produced. The purpose of this is so that the Court can understand the depositions in the context of how questions and answers developed.

At times in this opinion, the Court will take notice of and include factual statements that were not intended to be offered (that is, they were lined-out), but which are available to be read and are clearly understood in their context. One example of this is the inclusion of Batten's testimony of what Pickens told him before they went to Robbie's home on Sunday, November 6th. Although lined-out as not being offered for consideration on the motion for summary judgment, the Court sees no reason not to consider such unoffered parts when their purport is clear and lends meaning to the events. Although the Court was first confused as it attempted to understand the record in the Bates-numbered order of presentation, it does not mean to imply that plaintiffs' counsel was attempting to mislead. The Court, however, does not encourage the practice.

deposition ["Moy."] at # 000212.) Robbie was going to be involved in the activities that he described. (Moy. 213.) During the discussion, "it became apparent" to Moyers that this was the juvenile whom Pickens had talked to him about. (Moy. 212.)

At this point in the telling of events, the accounts of defendants Collins and Moyers differ from those of defendants Pickens and Batten. Collins said that when they realized that this was the person who had contacted Pickens, he called Pickens "by our radio" and told him what was happening. At the time, Pickens and Batten were "across the city". Collins said that Pickens told him "that it was okay, that everything had been taken care of, meaning the parental consent or permission or whatever." (Col. 145.) For whatever reason, Moyers apparently did not hear Pickens' response to Collins, because Moyers said that "Collins had told me Detective Pickens advised him that everything was Kosher, if you will, with the boy ..." Moyers also recalled that several days before, Pickens told him that he had the mother's consent. (Moy. 47.)

With Robbie in their car, and while waiting for Pickens and Batten to join them at the Burger King, Collins and Moyers devised the plans for the arrests of those involved in the planned drug deal. The plans were that Collins and Moyers would drive Robbie to the apartment building where the transaction was to occur; they would observe him enter the building; they would then observe him leave with the person who had come to the apartment by car to pick up the drugs; and they would observe him leave with that person in his car. When in the car, Robbie would ask to be let out at a certain 7–11 Store so that he could use the telephone. When he got to the telephone, that would be the signal that the drugs were in the car. Both would then be arrested, but Robbie's arrest would be a sham for his protection. (Col. 145–7; Moy. 212–3.) Collins "seem[ed] to remember that the three of us [Collins, Moyers and Robbie] were in the car when [Pickens

and Batten] pulled up" at the Burger King. (Col. 146.)

Contrary to the testimony of Collins and Moyers, Pickens said that as of November 11th—the evening Robbie was meeting with Collins and Moyers at the Burger King—he had no intention of using Robbie as an informant, because "I was doing the background investigation[;] I was not using him as a working informant at that time." (Pick. 22, 24.) In fact, Pickens said that he was unaware that Robbie had been back in touch with the vice unit. Pickens said that he and Batten received a radio call to meet Collins and Moyers at the 7–11 and "to take the person down that goes to the pay phone [and] we didn't know who it was until we took the person down." (Pick. 22.) He said that that was the first contact that he had had with Robbie since the contacts at his home.[4] (Pick. 23–25.)

Batten's account of the events of the evening of November 11th confirms those of Pickens, except with greater detail. Batten stated:

Detective Pickens and I were out on patrol, and we received a radio message from Sergeant Moyers to go to the 7–Eleven store on Holland and Windsor Oaks and stand by at that location, and he gave us a description of a vehicle that was supposed to be pulling into the parking lot, and a takedown signal was going to be when one of the people in the car went to a telephone. Apparently they must have been in a better position to see, speaking about Sergeant Moyer and Detective Collins, because Detective Pickens and I were beside the 7–Eleven on Windsor Oaks and couldn't actually see the phones, I don't believe. The next thing I recall is a transmission coming over the radio telling us to move in. We moved in.

Detective Pickens and myself approached the subject at the phone, which was the subject Bobby, placed him up against the wall. I believe it was Sergeant Moyers and Detective Collins that approached the car, and there was a fe-

---

**4.** These contacts were the in-person visit on Sunday, November 6th and the telephone call on the 7th when Pickens called to speak to Mrs. Williamson.

male and a male in the car. They got them out of the car, and apparently found some cocaine. Everyone was placed in handcuffs. Detective Pickens and I placed the subject Bobby in the car we were driving in, and we took Bobby to his house and let him out of the car, and that was my involvement with Bobby.

(Bat. 93–94.) [5]

In Moyers' interview in connection with the police internal investigation, he said that after "the Williamson boy did, in fact, enter an apartment ... and make a purchase of cocaine for us ... [he] was debriefed after the buy by myself, given an appropriate cover story for the situation [and then] I advised Batten to take [him] back home...." (PAS at 572.)

Pickens said that he and Batten drove Robbie home "[s]everal minutes after everybody else had left the area." (Pick. 37.) Collins and Moyers took the others who were arrested "down to headquarters." (Pick. 60.)

Collins said that Robbie carried out his part of the operation well: "He did everything to the tee." (Col. 150.) Robbie was advised that there were risks to being an informant even when anonymity is attempted. (Col. 164.)

On Saturday morning, November 12th, at 2:40 a.m.—about two hours after the events at the 7–11—Collins executed an Affidavit For Search Warrant for the apartment previously identified by Robbie. (PAS at 585–87.) The affidavit used "CI# 175" instead of Robbie's name as the source of the information for the affidavit. The affidavit also outlined the events that had occurred that evening up to the arrests

at the 7–11. The affidavit stated that "[b]oth white male subjects were found to have cocaine in their possession." The affidavit identified one of the white males as Grayson Daniels. The other white male would have been Robbie, but Robbie's name was not included in the affidavit.

From Collins' affidavit, it appears that the arrests at the 7–11 had occurred shortly after 12:30 a.m., on Saturday, November 12th. In other words, although Robbie called the vice unit from the Burger King Friday evening, it was early Saturday morning when Grayson Daniels, the female with him, and Robbie drove to the 7–11. The search of the apartment was conducted at 3:40 a.m. on Saturday morning. (PAS at 584.) A juvenile and an adult were in the apartment and were arrested. (Col. 148.) [6]

There is nothing in the record concerning Robbie's activities between very early Saturday morning, when Pickens and Batten took him home after his sham arrest at the 7–11 Store, and very early Sunday morning, except that Mrs. Williamson said that he had been out "the night before", i.e., Saturday night. Before he left, she asked him where he was going. She said that he told her that "he had to take care of something". He returned in about two and a half hours and said he had been out "just to take care of something." [7] (Wmson. 415.)

David Williamson, Robbie's younger brother, said that "[t]he night before [Robbie] passed away" (PAS, D. Williamson deposition ["Dav."] at Bates # 000425), "after midnight",[8] Robbie told him how the police had "use[d] him undercover and they didn't give him their—like their warrant

---

**5.** In a recorded interview conducted by the police as part of an internal investigation, Batten gave a conflicting account of the events. He said: "When we arrived at the Burger King we pulled up beside Sgt. Moyers who also had Officer Collins in the car with him and a white male who was Bobby in the back seat. Sgt. Moyers asked ... I don't know whether the question was directed at me or Officer Pickens but he asked us both, 'Do you know this guy?' Officer Pickens responded, 'Yeah,' and I said, 'Isn't that Bobby,' and he said, 'Yes, it is.'" (PAS, 576.)

**6.** There may have been only one arrest at the apartment. Internal Investigation Memorandum at PAS, 569 so indicates.

**7.** In other words, by early Sunday morning when Robbie returned home after being out for a couple of hours, approximately 24 hours had passed since Batten and Pickens drove Robbie home following his sham arrest.

**8.** This reference probably is to after Saturday midnight, which would be early Sunday, November 13th.

thing after they got out of jail." (Dav. 426, 426A.) David added:

> They gave his friends theirs, but they didn't give him his and his friend found out about it and put things together and they had asked Robbie if he had narked on them. And they had figured out it was him and they had—one of his friends, I'm not sure who it was, had threatened to hurt my mom and me, and he said that he'd do anything he had to do to keep from anything happening to me and my mom.

(Dav. 426A.)

Mrs. Williamson said that on "Sunday morning before [Robbie] died that night . . . [h]e told me that he had been working undercover for the police" (Wmson. 413), and "[h]e told me he thought maybe it might help solve some drug problems, [and] make up for what he had done." Mrs. Williamson also said that Robbie told her that he had received threats from the persons he had "narked on." (Wmson. 414.) He also said that "he had received some threats . . . from . . . Nick, Tom and, you know, the gang." (Wmson. 418.) This conversation of "three hours or more" was after Robbie had "kept David up practically all night talking." [9] (Wmson. 416.)

Robbie was found dead Sunday evening, November 13th, at home. The cause of death was acute Nortriptyline poisoning and plaintiffs contend that he committed suicide because of the threats he had received.

In January, 1988, ten months before the events just recounted, Robbie Williamson had been convicted of grand larceny and breaking and entering in the juvenile court of Virginia Beach. A presentence investigation was made and a report was prepared by Laura Moran, a probation counselor with the Court Services Unit. She learned that illicit drug abuse was one of Robbie's main problems and she recommended that he have intensive probationary supervision and undergo a psychological workup, because it was evident to her that "he was in need of psychiatric care, extensive psychiatric care." (PAS, Moran deposition ["Mor."] at Bates # 000658).

On February 8, 1988, as part of his probation, Robbie was admitted to Tidewater Psychiatric Institute ("TPI") under the treatment of Daniel L. Darby, M.D., a psychiatrist. He was then 16 years old. The admission diagnosis was 1) conduct disorder, socialized aggressive type; 2) substance abuse, marijuana, alcohol, cocaine and acid, and; 3) dysthymic disorder (PAS, 533), which is depression. He was discharged on March 14th, with essentially the same diagnosis. In the discharge summary, Dr. Darby made reference to a couple of times when Robbie had suicidal thoughts while in TPI. He concluded: "The patient was then discharged into court's care without maximum benefit, prior to recommended date." (PAS, 538.) One of Robbie's discharge medications was Nortriptyline, an antidepressant. When discharged, Robbie was placed in Tidewater Detention Home. On March 29th, he was readmitted to TPI with the following notation by Dr. Darby: "Robert demonstrates the following signs and symptoms: depressed mood, transcient [sic] hopelessness and helplessness, transcient [sic] suicidal thoughts, oppositional & negativistic reactions to authority. He's unrealistic to feel misused and abused and unrealistically quick to feel rageful [sic] and violent." (PAS, 542.) He was discharged on May 6, 1988.[10] The discharge diagnosis remained the same, except for substance abuse, which was "inactive." (PAS, 543.)

On February 13th, during Robbie's first TPI admission, he was visited by Detective

---

**9.** This revelation of the threats made to Robbie were disclosed by him to his mother Sunday morning. It was early Sunday, because Mrs. Williamson said that she had fallen asleep on the couch while Robbie was upstairs talking to David, and he came downstairs and woke her up. (Wmson. 416.) The death certificate states the opinion of the medical examiner was that death occurred at 11:44 p.m. on Sunday evening. Therefore, Mrs. Williamson knew of Robbie's involvement with the police and the threats for more than 12 hours before his death.

**10.** The record says "he was discharged on 5/6/88." (PAS, 543.) The narrative suggests that the discharge may have been on May 16th.

Douglas Williams, who questioned him about a robbery. The questioning had been sanctioned by Mrs. Williamson, Dr. Darby and a Dr. Bohlke. Mrs. Williamson was present during the questioning. The nurse's note of 9:40 p.m., February 13th, states: "[Mother] stated detective needed to find out who had a gun durring [sic] the robbery." Mrs. Williamson and Detective Williams arrived at 10:20 p.m., and the meeting with Robbie ended at 11:30 p.m. (PAS, 534–5.) Williams said that he knew Robbie was being treated for drug abuse but he was "really not sure" what other problems he had. (Wms. 407.) Detective Williams is the person whom Pickens said later told him that he had used Robbie as an informant with the permission of his mother.

Robbie was transferred from intensive probationary supervision to regular supervision by Laura Moran on August 1, 1988. Moran said that at that time "although he was still far from behaving as an upstanding citizen would behave, he was on the right track." (Mor. 667.) However, Moran recorded in her official notes on August 2nd that "[h]e's really angry at [his mother] for some reason or at least focusing on her with his anger." (Mor. 669.) On August 24th, Moran recorded that "Robbie is a threat to himself and others," based upon information given by Mrs. Williamson to Moran. (Mor. 671–2.) As a consequence, Moran had the police pick up Robbie and return him to detention. On August 25th, a juvenile court judge found probable cause for detaining Robbie for a hearing on September 12th. (PAS, 549.) During the probable cause hearing on August 25th, Robbie became enraged, punched a hole in the wall, screamed at the judge and ran out of the courtroom. He was restrained by sheriff's deputies. (Mor. 674.)[11]

Moran said that Mrs. Williamson was very active and cooperative in Robbie's probation. "She continuously took [him] to endless appointments with psychiatrists and counselors and [Narcotics Anonymous] meetings and probation officers. She made

sure that he had his medication." (Mor. 675.) In mid-October, Mrs. Williamson advised Moran that she no longer had a life of her own, instead, "her life revolved around ... getting [Robbie] to places he needs to go and also working with her younger son." (Mor. 676.) On October 26th, Robbie called Moran to tell her of his concern about his mother, who had been in bed for over a week." (Mor. 677.) On October 28th, Moran learned from Mrs. Williamson's older son, Steve, that his mother was still in bed and that he was "the psuedo [sic] parent" in the home then. (Mor. 678–9.) Thereafter, Moran had no more conversations with Robbie. (Mor. 680.) On November 14th, she learned of his death from Dr. Darby.

———

The use of informants by the police entails considerable risk to the informants and to their families. The risk includes dangers that may be encountered by informants who are active participants in the events that lead to arrests, and the danger of harm to the informant or his family if his identity is learned by those informed upon. All of the defendants who were asked, including Defendant Charles R. Wall, the Chief of Police of Virginia Beach, agreed that those risks exist for informants and have to be guarded against.

The Virginia Beach Police Department issued General Order 9.11 on June 1, 1987 to "establish procedures for the development, handling, and payment of informants." It states that the policy of the police department recognizes that "[i]nformers are one of the greatest assets to law enforcement." The policy statement clearly encourages the cultivation and grooming of informers. (PAS, 564.) Procedures are outlined to promote the aims of the policy statement. Those procedures are prefaced by the statement that "[t]he following guidelines should be used on the development, handling and payment of informants." (PAS, 565.) Part A, ¶ 16, of

---

**11.** The record does not disclose anything concerning a subsequent hearing in the juvenile court on September 12th.

the procedures section of General Order 9.11 provides: "Written permission from parents must be obtained when using juvenile informants." (PAS, 565.) Part B of the procedures section of General Order 9.11 establishes a file system for informants, which is designed partly to protect the identities of informants and partly to record background information about informants. (PAS, 566.)

Pickens and Batten stated that they had never seen General Order 9.11 (Pick. 7; Bat. 88–89), nor had they received any training concerning the use of informants. (Pick. 5; Bat. 85.) Pickens had been told by Moyers, in connection with the use of Robbie as an informant, that parental consent was required, but he was not told that the consent must be in writing. (Pick. 18, 31–32.) Collins said that he had received no special training with regard to the use of informants or of the application of General Order 9.11. (Col. 131.) When he was deposed, Moyers, who was their supervisor, could not recall any formal training given to the vice unit officers about General Order 9.11 or the use of informants. (Moy. 194–5.) Chief Wall believed the vice unit officers were sufficiently experienced in the use of juvenile informants (Wall 249), but he could not identify any training or instruction they had received. (Wall 249–50.) The subsequent police internal investigation of the incident concluded that Pickens had failed to get parental permission and this was because he had been inadequately trained. (PAS, 563; deposition of Charles H. Payne, PAS, 294.)

Before the night of November 11th, when Robbie made his second telephone call to the vice unit, Pickens had started a background investigation of Robbie (Pick. 13, 22), including running "a computer check on his criminal background." That was what led Pickens to learn that Detective Williams had previously arrested Robbie for robbery. (Pick. 40.) Pickens said that he did not know if Robbie "went to court on it yet" or was on probation, because "I was still in the middle of my background check." (Pick. 45.) He said that had he known Robbie was under pro-

bationary supervision, he would have contacted the probation officer. (Pick. 46.)

Laura Moran, Robbie's probation officer, said that a check of Robbie's criminal history records would have revealed "charges" of "breaking and entering, grand larceny, robbery [and] violation of probation." (Mor. 708.) If she had been asked for permission or consent to use him as an informant she would have denied the request, because "I felt that—I still feel that using Robbie as an informant adds extra stress to his already difficult day-to-day life." (Mor. 710–11.)

———

Daniel B. Kennedy, Ph.D., an expert in the field of police science, practice, and procedure, (PAS, 605), offered detailed opinions stating, *inter alia*, that a juvenile informant who is on probation should never be used without the consent of his parent, probation supervisor, and the court; that the procedures used by defendants during the early morning of November 12th, "in all probability resulted in his identity becoming known" to the arrestees; that a proper background investigation of Robbie, which would have revealed his mental health status, would have excluded him as a candidate for police informant; and that the failure to train officers on procedures for using informers was "a substantial and gross departure from … appropriate police practice and procedure." (PAS, 607–14).

———

Dr. Daniel L. Darby treated Robbie from February to November, 1988, i.e., from his admission to TPI as part of his probation, to the month of his death. (PAS, 597.) Dr. Darby said that Robbie and his mother had a relationship that was "critical" to him. He felt a responsibility for her well-being "and if [he] in fact felt that he had harmed or put his mother's life in danger or jeopardy, he would feel he would have to remedy that situation, with the probable result of suicide". It is Dr. Darby's opinion that Robbie committed suicide with an overdose of Nortriptyline. He said:

"The probable precipitating factor of Robbie's suicide was the resultant stress

from having felt that he had placed his mother and family in jeopardy due to Robbie's police informant activities. Robbie reported receiving threats against his mother and brother and in my opinion, Robbie's perception of these threats more likely than not precipitated his suicide."

(PAS, 598.)

Gary B. Zimberg, M.D., also a psychiatrist, who reviewed the records, expressed the same opinion in almost the identical words of Dr. Darby. He included as a precipitating factor "the resulting stress from being placed in a police undercover agent situation generally". (PAS, 594.)

### DISCUSSION

#### A. *Claims Against Individual Defendants*

In Count I of the Amended Complaint, seeking relief under 42 U.S.C. § 1983, plaintiff claims in her capacity as administratrix of Robbie's estate that Officers Moyers, Collins, Pickens and Batten [12] deprived Robbie of rights, privileges and immunities guaranteed to him by the Fourth, Fifth, Eighth and Fourteenth Amendments.

More specifically, plaintiff contends that the officers' conduct violated Robbie's constitutional rights to:

1) A duty of affirmative protection arising out of the "special relationship" created between the police and Robbie;

2) The benefit of the family bond with his parent, including parental care and guidance regarding important decisions; and

3) Freedom from conduct causing violations of physical and emotional integrity and unjustified intrusions on personal security, including his rights to bodily security, integrity and personal privacy.

In Count IV, plaintiff also claims in her individual capacity that all defendants, including Officers Moyers, Collins, Pickens and Batten, deprived her of rights, privileges and immunities guaranteed to her by the Fourth, Fifth, Eighth and Fourteenth Amendments. More specifically, plaintiff contends that the officers' conduct violated her constitutional rights to:

1) The care, custody and management of Robbie and his affairs; and

2) Freedom from deprivation of her parent-child relationship without due process of law.

The first question to be addressed in any claim under 42 U.S.C. § 1983 is

> whether the two essential elements of a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under the color of state law; and (2) whether the conduct deprived a person of rights, privileges, or immunities secured by the constitution or laws of the United States.

*Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981), *overruled in part by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Defendants have not seriously contested that their actions were other than under color of state law. Therefore, our focus is on isolating the particular constitutional violations alleged.

It is axiomatic that section 1983, standing alone, vests no substantive rights upon a plaintiff; it merely provides a remedy for deprivations of rights found elsewhere in the Constitution or in federal laws. *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2694 n. 3, 61 L.Ed.2d 433 (1979). The Due Process Clause of the Fourteenth Amendment provides, at a minimum, three different types of constitutional protections: it incorporates and makes applicable to the states specific protections embodied in the Bill of

---

**12.** The Complaint alleges these claims against the Officers in both their official and individual capacities. However, it is clear that naming a government official in his official capacity is the equivalent of naming the government entity itself as defendant; a plaintiff must plead and prove an official policy or custom of the munici-

pality as the cause of the constitutional violation. *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 3104, 87 L.Ed.2d 114 (1985). The claims against the defendants in their official capacities under Count I are therefore duplicative of Counts II and III of the complaint.

Rights; it guarantees a right to what has been termed "'substantive due process,' which bars certain arbitrary government actions 'regardless of the fairness of the procedures used to implement them;" and it provides a right to "procedural due process," in providing a constitutionally-required minimum of procedural safeguards in connection with a deprivation of life, liberty or property by the State. *Daniels v. Williams,* 474 U.S. 327, 337, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986) (Stevens, J., concurring); *see also Temkin v. Frederick County Comm'rs,* 945 F.2d 716, 720 n. 4 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1172, 117 L.Ed.2d 417 60 U.S.L.W. 3578 (U.S. Feb. 24, 1992). The bulk of plaintiffs' arguments are anchored in the right to substantive due process.[13]

*Count I—Robbie's § 1983 Claims Against Defendants*

■ *The Special Relationship Analysis*

[3]  Despite the myriad of constitutional theories asserted by the plaintiff, this case presents a relatively straightforward issue: whether the Constitution of the United States prohibits a police officer from using a juvenile who voluntarily comes forward with information of criminal activity as an informant without first obtaining parental consent or running a thorough background check. The plaintiff first asserts that the defendant officers owed Robbie an affirmative duty of protection based on the "special relationship" that exists between an informant and the police officers utilizing

him. In seeking recognition of this constitutional duty, plaintiff relies primarily on the Fourth Circuit cases of *Fox v. Custis,* 712 F.2d 84 (4th Cir.1983) and *Jensen v. Conrad,* 747 F.2d 185 (4th Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985), and on this Court's decision in *Swader v. Virginia,* 743 F.Supp. 434 (E.D.Va.1990).[14] The defendants argue in response that, under the analysis set forth by the United States Supreme Court in *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197, 109 S.Ct. at 1004.

While plaintiff does not identify the constitutional origin of the alleged special relationship, the Fourth Circuit opinions in *Fox* and *Jensen* reveal that the special relationship analysis arises under the Due Process Clause of the Fourteenth Amendment. *Jensen,* 747 F.2d at 193; *Fox,* 712 F.2d at 87–88. The right to affirmative protection claimed, however, finds its roots in a series of cases under the Eighth Amendment. Those cases hold that the proscription against cruel and unusual punishment imposes a duty on the states to protect "inmates in the state's prisons or patients in its mental institutions whom the state knows to be under a specific risk of harm from themselves or others in the state's custody or subject to its effective control."

---

13.  The Second Amended Complaint alleges that plaintiff's causes of action arise under, *inter alia,* "the Fourth, Fifth, Eighth and Fourteenth Amendments ... as hereinafter more fully appears." (Second Amended Complaint, ¶ 1.) Nowhere does plaintiff argue, nor does the Court find any support for the contention that Robbie was unreasonably seized in violation of the Fourth Amendment. *See California v. Hodari D.,* —— U.S. ——, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *Florida v. Bostick,* —— U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). Further, plaintiff does not identify, and this Court cannot locate, any right guaranteed by the Fifth Amendment which is implicated by the circumstances of Robbie Williamson's death.

14.  The cases plaintiff relies on to show the existence of a special relationship specifically be-

tween an informant and the police giving rise to an affirmative duty to protect are unavailing. Those cases, *Miller v. United States,* 561 F.Supp. 1129 (E.D.Pa.1983), *aff'd* 729 F.2d 1448 (3rd Cir.); *Swanner v. United States,* 309 F.Supp. 1183, 1187 (M.D.Ala.1970); *Estate of Tanasijevich v. City of Hammond,* 178 Ind.App. 669, 383 N.E.2d 1081 (1978); *Schuster v. City of New York,* 5 N.Y.2d 75, 180 N.Y.S.2d 265, 154 N.E.2d 534 (1958); and *Maynard v. City of Madison,* 101 Wis.2d 273, 304 N.W.2d 163 (Ct.App.1981), establish a special relationship giving rise to a tort duty under state negligence law. Such a state law duty "does not transform every tort committed by a state actor into a constitutional violation." *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 201–02, 109 S.Ct. 998, 1006–07, 103 L.Ed.2d 249 (1989).

*Fox,* 712 F.2d at 88; *see also Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("deliberate indifference" to medical needs of inmates by prison officials violates Eighth Amendment); *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (involuntarily committed mental patients have Fourteenth Amendment right to services necessary to ensure their "reasonable safety").

In *Jensen,* the Fourth Circuit traced the subsequent expansion of that right in *Fox* and the decisions of other circuits in addressing whether the State and its officials had an affirmative duty to protect children from harm at the hands of their guardians. 747 F.2d at 190–94. The *Jensen* court stated that, based upon the expansion of the affirmative duty of the State to protect evidenced in the cited decisions and upon dictum in *Fox* stating that "special custodial or other relationships" entered into by the State might create an affirmative duty of protection, 712 F.2d at 88, "a right of protection may, given the proper facts, exist at present." 747 F.2d at 194.

The *Jensen* court ultimately decided that any right that might be stated by the plaintiffs would necessarily give rise to a qualified immunity defense on the ground that such right was not clearly established at the time. *Id.* The court did proceed, however, to list some of the factors to be included in a special relationship analysis.[15]

The Fourth Circuit did not return to the special relationship question until after the Supreme Court decision in *DeShaney.*[16] In *DeShaney,* the Supreme Court dealt with virtually the same question faced by the *Jensen* court: whether a municipal department of social services with notice of danger to Joshua DeShaney had an affirmative duty under the Due Process Clause to protect the child from an abusive parent. The *DeShaney* Court traced the development of the special relationship "notion" through the same Eighth Amendment evolution relied upon by the Fourth Circuit in *Fox* and *Jensen.* *DeShaney,* 489 U.S. at 197–99 & n. 4, 109 S.Ct. at 1004–05 & n. 4. The Court then proceeded to categorically reject that analysis:

> Taken together, [the Eighth Amendment cases] stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time, fails to provide for his basic human needs ... it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. *The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.* [Cf.

**15.** The factors cited by the *Jensen* court included:

  1) Whether the victim or the perpetrator was in legal custody at the time of the incident, or had been in legal custody prior to the incident.

  ....

  2) Whether the state has expressly stated its desire to provide affirmative protection to a particular class or specific individuals.

  ....

  3) Whether the State knew of the claimants' plight.
*Id.* at 194 n. 11

**16.** Those lower courts within the Fourth Circuit that addressed the *Jensen* analysis prior to *De-Shaney* generally found, as did the *Jensen* court,

that the defendants were entitled to qualified immunity because the special relationship analysis did not encompass clearly established rights. *See, e.g., Nesmith through Nesmith v. Grimsley,* 702 F.Supp. 122 (D.S.C.1988) (assuming special relationship, officials of the Citadel had qualified immunity as to § 1983 claims stemming from hazing incident); *Piechowicz v. United States,* 685 F.Supp. 486 (D.Md.1988) (U.S. attorney and DEA agent qualifiedly immune from § 1983 claims stemming from murder of government witness with whom government had special relationship), *aff'd on other grounds,* 885 F.2d 1207 (4th Cir.1989); *Turner v. City of North Charleston,* 675 F.Supp. 314 (D.S.C.1987) (police warned of threats against private citizen had qualified immunity).

*Jensen*, 747 F.2d at 194 n. 11] In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*Id.* at 199–200, 109 S.Ct. at 1004–06 (original citations and footnotes omitted) (emphasis added).

However, the *DeShaney* Court left open at least two questions. First, the Court explicitly declined to express any view on the holdings of several Courts of Appeals, "by analogy to *Estelle* and *Youngberg,* that the State may be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents." *Id.* at 201 n. 9, 109 S.Ct. at 1006 n. 9. In such a case, the Court stated, "we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." *Id.*

More important for the purposes of this case, however, is language in the *DeShaney* opinion that does not foreclose the possibility that an affirmative duty under the Due Process Clause might arise in a situation where the State played a role in creating the danger faced by a citizen:

Petitioners concede that the harms Joshua suffered did not occur while he was in the State's custody, but while he was in the custody of his father, who was in no sense a state actor. While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter.

*Id.* at 201, 109 S.Ct. at 1006.

In *Swader v. Virginia,* 743 F.Supp. 434 (E.D.Va.1990), this Court examined whether the special relationship analysis retained any viability after *DeShaney.* *Swader* concerned whether a prison employee, required by the State defendants to live on prison grounds, could state a cause of action under § 1983. The suit stemmed from the rape and murder of plaintiff's daughter by a prisoner permitted, in violation of prison regulations, to work unsupervised in the non-fenced portion of prison property where plaintiff and her daughter resided.

The question in *Swader* was framed as "whether the State may, under any circumstances, fall under a constitutional obligation to take affirmative steps to protect an individual outside of a particular custodial context." 743 F.Supp. at 436. Judge Clarke, relying heavily on the consideration, expressed *supra,* in *DeShaney* that the defendant municipality had not acted in any way to place Joshua in danger or to increase his vulnerability to the danger that ultimately overtook him, held that *DeShaney* was factually distinguishable from the situation presented in *Swader* and proceeded to apply the three factors set out by the Fourth Circuit in *Jensen* to identify a special relationship. *Id.* at 439–40. Judge Clarke ultimately found that the plaintiff had alleged sufficient facts to survive a motion to dismiss.

*Swader* does not support plaintiff's argument. In *Swader,* the Court faced a situation where the plaintiff and her decedent were required to reside on prison property as a condition of employment. *Id.* at 442. The State also owned and maintained the private roads providing the only routes to and from the Swader home. *Id.* "Thus, the plaintiff's decedent was placed in an environment not perfectly analogous to the 'free world' of Joshua DeShaney, but closer to a situation analogous to incarceration or institutionalization where the State exercises a greater degree of control." *Id.* Further, the State also exerted its control over the source of the danger, in this case, an

inmate serving a life sentence for rape who had been allowed beyond the secure area of the prison without supervision; immediately after being so allowed, the inmate raped and murdered the decedent. *Id.*

The level of control exercised by the Virginia Beach Police Department over Robbie Williamson varies dramatically from the situation presented in *Swader.* It is uncontested that Robbie voluntarily contacted the Virginia Beach Police Department twice to provide information about illegal drug transactions. Plaintiff has neither alleged nor produced any evidence to support an inference that Robbie was in any way coerced into signalling the officers that the drugs were in the car in question. In fact, Robbie had already arranged to get a ride with the people he was informing on before the police ever arrived on the scene. As such, this is not a situation "sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." *DeShaney,* 489 U.S. at 201 n. 9, 109 S.Ct. at 1006 n. 9.[17]

While Robbie was subsequently taken into "custody" as a sham to provide him with a cover story for his protection, he was taken from that custody to a place of safety, his home. Once there, he had the opportunity to, and in fact did, seek the counsel of his family members. Thus, this is not a case, as in *Swader,* where the State has cut an individual off from all means of help.[18] The transient custody into which Robbie was placed during the sham arrest did not ultimately make the State "the permanent guarantor" of Robbie's physical or mental well-being. *See Weller v. Department of Social Servs.,* 901 F.2d 387, 392 (4th Cir.1990) (State had no affirmative duty to protect child from injuries suffered at hands of mother when State removed child from father's custody without hearing and placed custody with mother) (quoting *DeShaney,* 489 U.S. at 201, 109 S.Ct. at 1006).

Finally, it should be noted that, while the State does necessarily place a private citizen into a position of some danger by using him as an informant, whether or not it was at his own behest, Robbie did not succumb to that danger. The recognized risk to an informant is the possibility of retaliatory harm against him or his family, not the possibility that the informant will take his own life. The Fourth Circuit has specifically held that police officers have no duty under the Due Process Clause to screen pretrial detainees for suicidal tendencies. *Belcher v. Oliver,* 898 F.2d 32, 34–35 (4th Cir.1990). To impose a duty on law enforcement officers to screen citizens who volunteer their help for such tendencies would completely foreclose the use of such persons in the prevention of crime. Plaintiff has presented no evidence creating a genuine issue of material fact that the de-

---

**17.** A number of post-*DeShaney* cases have imposed liability under a "special relationship" analysis where the injured party was in the functional custody of the State when the harm complained of occurred. *See, e.g., Horton v. Flenory,* 889 F.2d 454 (3rd Cir.1989) (fatal "interrogation" of burglary suspect by owner of private club acquiesced in by police department policy and individual officer is custodial); *Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720 (3rd Cir.1989) (duty to protect student from sexual assault by school employee, a state actor), *cert. denied,* 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990); *Pagano by Pagano v. Massapequa Pub. Sch.,* 714 F.Supp. 641 (E.D.N.Y.1989) (elementary school students required by law to attend school entitled to some affirmative protection from abuse by other students during school day); *but see J.O. v. Alton Community Unit Sch. Dist. 11,* 909 F.2d 267, 272–73 (7th Cir.1990) ("School children are not like mental patients and prisoners such that the

state has an affirmative duty to protect them."); *Reeves by Jones v. Besonen,* 754 F.Supp. 1135 (E.D.Mich.1991) (no duty to protect student from hazing at hands of other students during *voluntary* participation on school football team). Such is not the case here.

**18.** *Cf. Gregory v. City of Rogers,* 921 F.2d 750 (8th Cir.1990) (inebriated passengers had right to protection where police officer removed designated driver), *opinion vacated and reh'g en banc granted,* 939 F.2d 524 (8th Cir.1991); *Wood v. Ostrander,* 879 F.2d 583 (9th Cir.1989) (opinion after rehearing) (passenger left stranded by police officer in high crime area after arrest of driver and impoundment of vehicle stated claim of affirmative duty to protect), *cert. denied,* — U.S. —, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990); *Walton v. City of Southfield,* 748 F.Supp. 1214 (E.D.Mich.1990) (minors left in vehicle upon arrest of mother and grandmother stated Due Process claim).

fendants knew or had reason to know that Robbie was suicidal.[19]

*Swader*, therefore, is readily distinguishable and has no application to the instant case. Prior to *Swader*, the Fourth Circuit examined the rights of a government witness to an affirmative duty of protection under the Due Process Clause in the aftermath of *DeShaney* in *Piechowicz v. United States*, 885 F.2d 1207 (4th Cir.1989), *aff'g* 685 F.Supp. 486 (D.Md.1988). David and Cheryl Piechowicz, employees of a Baltimore hotel, testified under subpoena at a pretrial suppression hearing held in the prosecution of Anthony Grandison on federal drug and firearms charges regarding contraband uncovered in Grandison's hotel room. 885 F.2d at 1210. The Piechowiczes were also under subpoena to testify at Grandison's upcoming trial. *Id.*

Prior to her testimony at the suppression hearing, Cheryl Piechowicz reported to the Assistant United States Attorney and the Special Agent of the Drug Enforcement Administration involved in the case that she had been approached by a woman who made statements that the Piechowiczes perceived as threats. *Id.;* 685 F.Supp. at 488. The attorney relayed the incident to the presiding judge, who warned all present in the courtroom to refrain from making threats against witnesses. The Piechowiczes never specifically requested protection, and no government agent ever specifically offered to provide protection. 885 F.2d at 1210.

Five days before the start of Grandison's trial, David Piechowicz and his sister-in-law, Susan Kennedy, were murdered by a hired killer. David was killed to prevent him from testifying; Susan was killed in the mistaken belief that she was Cheryl. *Id.;* 685 F.Supp. at 489. Their survivors brought a § 1983 action against the attorney, the DEA agent and the United States for violations of the decedents' rights under the Due Process Clause of the Fifth Amendment.[20]

The district court, in an opinion issued prior to *DeShaney*, granted the individual defendants' motions to dismiss on the grounds of qualified immunity. In doing so, the district court reviewed the analyses set out in *Fox* and *Jensen*. 685 F.Supp. at 491. The court concluded, albeit without applying the factors set out in *Jensen* to the case at bar with any specificity, that the government did have a special relationship with David Piechowicz. *Id.* at 492. However, as David Piechowicz was murdered three months before the Fourth Circuit issued its opinion in *Fox*, the court concluded that the defendants were entitled to qualified immunity because the rights at issue were not clearly established. *Id.*

Subsequent to the United States Supreme Court decision in *DeShaney*, the Fourth Circuit affirmed the district court's decision in *Piechowicz*. While the appellate court agreed that "no 'special relationship' between Grandison's victims and the United States created any rights vindicable

---

**19.** Plaintiff claims that Det. Williams' deposition testimony regarding his February 13 conversation with Robbie at TPI raises a genuine issue of material fact regarding whether the officers involved had knowledge of Robbie's suicidal tendencies. This argument is wholly without merit. The detective stated that "The best I can remember, ... the talk about he had a drug problem and he was experimenting with drugs [and] had gotten into some trouble. As far as other emotional problems, ... I'm really not sure. There probably could have been, but I'm really not sure." (Wms. 407) There is no testimony from Robbie's mother, who requested that the detective be permitted to speak to Robbie and was present at the interview, that she, Robbie or anyone else told the defendant that Robbie had had suicidal thoughts. There is no evidence that Williams ever spoke to any of Robbie's

doctors. Detective Williams' testimony, standing alone, does not create a genuine issue of fact on which a jury could properly find for the defendant by a preponderance of the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–52, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

**20.** The Due Process Clause of the Fifth Amendment provides protection from actions of the federal government coextensive with the protections provided by the Fourteenth Amendment Due Process Clause against the actions of state and local governments. *See, e.g., Paul v. Davis*, 424 U.S. 693, 699–701, 96 S.Ct. 1155, 1159–61, 47 L.Ed.2d 405 (1976); *Curry v. McCanless*, 307 U.S. 357, 59 S.Ct. 900, 83 L.Ed. 1339 (1939).

by the plaintiffs," 885 F.2d at 1214, it arrived at this conclusion in a somewhat different fashion from the lower court. Despite the district court's reliance on the *Jensen* analysis and conclusion that David had a special relationship with the government, the Fourth Circuit found that, in light of *DeShaney*, "the United States had no due process duty to protect David and Cheryl against the depredations of a ruthless federal defendant." *Id.* (footnote omitted) After reviewing the *DeShaney* decision, placing special emphasis on the Eighth Amendment roots of the special relationship concept, the *Piechowicz* court concluded that "[t]he implications of *DeShaney* for the plaintiffs' argument are clear, and devastating. The United States did not trigger the Due Process Clause because it never took David or Cheryl into its custody." *Id.*

This Court believes that *Piechowicz* controls the disposition of plaintiff's claim to a special relationship with the state. While the Virginia Beach Police Department and its officers did exhibit a desire to protect Robbie, such expressions of intent do not trigger the protections of the Due Process Clause. *DeShaney*, 489 U.S. at 200, 109 S.Ct. at 1005. If anything, the facts in *Piechowicz* present a stronger case for the imposition of an affirmative duty to protect. While David Piechowicz was compelled to testify through the exercise of governmental power, Robbie Williamson initiated his contact with the State, and was a voluntary participant throughout.[21] Further, the government had actual knowledge of the threat of harm facing the Piechowiczes. The officers here cannot be charged with knowing or having reason to know that Robbie was suicidal. In spite of the strength of the Piechowiczes' claim under *Jensen*, the Fourth Circuit clearly stated the relevant factor in evaluating special relationship claims: "substantive due process protects the liberty interests only of persons affirmatively restrained by the [State] from acting on their own behalf." 885 F.2d at 1215.

Because the State in this case did not so restrain Robbie's liberty as to "render him incapable to care for himself," *DeShaney*, 489 U.S. at 200, 109 S.Ct. at 1005, the substantive component of the Due Process Clause affords him only those residual protections "intended to secure the individual from the arbitrary exercise of the powers of government." *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986).

> Stated another way, some abuses of governmental power may be so egregious or outrageous that no state post-deprivation remedy can adequately serve to preserve a person's constitutional guarantees of freedom from such conduct. Thus, conduct which "shocks the conscience" or conduct which "amount[s] to a brutal and inhumane abuse of official power literally shocking to the conscience."

*Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 720 (4th Cir.1991) (citations omitted), *cert. denied*, ——— U.S. ———, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992).

■ Contrary to plaintiff's contention, this analysis does not present a jury question. "[A]rbitrary Government action ... must 'shock the conscience' of federal judges." *Collins*, ——— U.S. at ———, 112 S.Ct. at 1068. While Robbie's decision to take his own life is most certainly tragic, the officers' decision to utilize Robbie without parental consent in a situation where criminal activity was imminent does not meet this "most stringent standard against which state action is to be measured in assessing a substantive due process claim." *Rucker v. Harford County*, 946 F.2d 278, 281 (4th Cir.1991), *cert. denied*, ——— U.S. ———, 112 S.Ct. 1175, 117 L.Ed.2d 420 (1992).

■ Although the parties have addressed the issue only tangentially, this Court has also considered whether General

---

21. His voluntary participation in and of itself would appear to foreclose his claiming that the State deprived him of a liberty interest. *See Collins v. City of Harker Heights*, ——— U.S. ———, ———, 112 S.Ct. 1061, 1069, 117 L.Ed.2d 261 (1992), (city employee cannot claim deprivation of liberty based on city's failure to train regarding known workplace hazards when the city made, and the plaintiff accepted, an offer of employment).

Order 9.11 created any liberty interest in the plaintiff which would invoke the protections of either the substantive or the procedural branch of the Fourteenth Amendment Due Process Clause. It is settled that "a State may create a liberty interest protected by the Due Process Clause through its enactment of certain statutory or regulatory measures." *Hewitt v. Helms*, 459 U.S. 460, 469, 103 S.Ct. 864, 870, 74 L.Ed.2d 675 (1983). However, not every promulgation issued by a governmental body implicates the Constitution of the United States. *See, e.g., Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 461, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989). Only those "mandatory state regulations or statutory directives which affect an individual's liberty may create a protected liberty interest." *Edwards v. Johnston County Health Dep't*, 885 F.2d 1215, 1220 (4th Cir.1989).

Neither Robbie nor his mother have a liberty interest in the procedures set up by the Virginia Beach Police Department for the handling of informants. The procedures relied upon by the plaintiff in General Order 9.11 are "guidelines [that] should be used in the development, handling and payment of informants." (PAS at 564). Such merely procedural guidelines do not create a constitutionally protected interest. *Hewitt*, 459 U.S. at 471, 103 S.Ct. at 871; *Edwards*, 885 F.2d at 1220.

General Order 9.11 in no way restricted Robbie's right to do as he pleased. In fact, the very nature of his voluntary involvement in the complained of activities undermines his ability to claim a violated liberty interest. *See Collins*, 112 S.Ct. at 1069. Nor is the General Order raised to the level of a constitutional requirement because some officers may have subjectively believed that the requirement of parental consent was "putatively designed to comply with constitutional requests." (Pl.Supp. Mem.Opp.Summ.J. at 4–5; *see also*, PAS 164–65, 244–45, 284–85.) [22] The failure of the officers in this case to follow department guidelines does not implicate the United States Constitution.

■ *The Right to Parental Care and Guidance*

■ Plaintiff asserts a number of other theories in an attempt to establish a liberty interest. In her capacity as administratrix of Robbie's estate, plaintiff further claims that the officers' conduct violated Robbie's constitutional right to the benefit of the family bond with his parent, including parental care and guidance regarding important decisions. In support of this claim, plaintiff relies on *Duchesne v. Sugarman*, 566 F.2d 817 (2d Cir.1977), to establish that such a right existed under the particular circumstances of this case.

In *Duchesne*, the Second Circuit found a constitutional deprivation of a protected liberty interest where, after lawfully taking custody in an emergency situation, child welfare officials refused to return two children to their mother's custody for over twenty-seven (27) months without providing the mother an opportunity to be heard "at a meaningful time and in a meaningful manner." *Id.* at 824.

The court is mindful of the existence of a "private realm of family life which the state cannot enter." *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442,

---

**22.** Plaintiff's attempts to stretch officers' statements regarding their belief that "court decisions" requiring parental consent before the police could question juveniles into a constitutional requirement go beyond the pale. The Court finds it telling that the plaintiff cites no caselaw to support the broad Due Process right that she, and apparently some officers, would bestow upon juveniles to be able to hide from the law behind their parents. While minors are entitled to the same panoply of due process rights as adults, and parents are to some extent entitled to be notified of their child's due process rights, *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), the Court has found no caselaw to support the proposition that the police must check with a minor's parents before utilizing that minor in the prevention of crime. That it is wise to obtain parental consent prior to involving a minor in such activities is beyond question. Where, as here, the minor comes forward of his own accord with information of incipient criminal activity, raising the advisability of parental consent to a constitutional mandate would unduly restrict the officer's ability to act on that information in the manner he deems necessary.

88 L.Ed. 645 (1944). It is not, however, prepared to hold that the use of a juvenile as an informant, even without parental consent, is comparable to the total, sustained deprivation of custody which occurred in *Duchesne.* At most, in the present case, there were only a few hours in which Robbie was unable to consult with his parent. Nor, in addition, was Robbie in the "custody" of the defendant officers. In light of these circumstances, the court declines to find that Robbie's right to the benefit of his family bond with his parent was violated.

■ *The Right to Physical and Emotional Integrity*

■ Plaintiff's final claim as administratrix is that the officers' conduct deprived Robbie of his constitutional rights to be free from conduct causing violations of physical and emotional integrity and unjustified intrusions on personal security and his rights to bodily security, integrity and personal privacy. To support her assertions of these claims, plaintiff relies on *White v. Rochford,* 592 F.2d 381 (7th Cir. 1979).

In *White,* the Seventh Circuit found a constitutional deprivation where police officers, after having arrested the custodian of three minor children for drag racing, abandoned the children in the custodian's automobile on the side of an eight-lane expressway, exposing the children to the cold and forcing them to walk along the expressway in search of a telephone.

The facts and circumstances surrounding the present case do not constitute a violation of the right asserted in *White.* In the present case, Robbie asked the police to intervene in a potentially dangerous situation into which Robbie was going to place himself (with or without the police). The police, admittedly, did not know that Robbie had experienced mental health problems prior to agreeing to use him as an informant. Once the police intervention occurred in the present case, however, they took affirmative steps to insure Robbie's safety by treating him as just another arrestee and by delivering him safely home to his mother. In *White,* by contrast, the officers acted to affirmatively place the children in a dangerous situation and, once they had done so, did nothing to see that the children were safe. And, most crucially, these cases are distinguishable because Robbie, unlike the children in *White,* was injured *after* he was safely in the custody of his mother; in fact, Robbie had advised his mother of what had happened and of the threats he received and she chose to do nothing in the way of getting protection or medical help. The court finds, therefore, that the conduct of the officers did not deprive Robbie of his right to be free from conduct causing violations of physical and emotional integrity and unjustified intrusions on personal security and his right to bodily security, integrity and personal privacy.

*Count IV—Plaintiff's Claims for Violations of Personal Constitutional Rights.*

■ *The Right to the Care, Custody and Management of One's Child*

■ In her individual capacity, plaintiff asserts that the officers' conduct violated her right to the care, custody and management of Robbie and his affairs. In support of this claim, plaintiff invokes a number of Supreme Court cases and a Third Circuit case, *Prisco v. United States Department of Justice.*[23]

While there is general language in each of the Supreme Court opinions cited by plaintiff which recognizes a constitutional right to freedom of personal choice in family matters, in none of the opinions is the question of the scope of such a right addressed. *See Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (parent's right to raise child not violated by state law prohibiting children from distributing religious literature on a public street); *Lassiter v. Department of Social Servs.,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (trial court did not err in failing to appoint counsel for indigent mother involved in a hearing to terminate her parental rights); *Santosky v. Kramer,*

**23.** 851 F.2d 93 (3d Cir.1988), *cert. denied* (1989).

455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ("preponderance of the evidence" standard in proceeding to terminate parental rights violates the Due Process Clause of the Fourteenth Amendment). At most, in *Santosky* for example, the Court was confronted with a situation where a direct action of the state was performed which was *intended* to, and *did* dissolve the parental rights of the appellant parent.[24] No such intent to dissolve plaintiff's right to the care, custody and management of Robbie can be found in the facts of the present case. At most, in this case, plaintiff can argue that the defendant officers were negligent in ascertaining background information and despite their ignorance of his background, they intended to use Robbie as an informant without plaintiff's permission. This is a far cry from the situations of *Santosky* and *Prisco*, where the state sought to completely usurp the role of the parent. In light of the great factual disparity between previous applications of the right (i.e. intentional deprivation of total custody), the court declines to find that the officers' conduct in this case violated plaintiff's right to the care, custody and management of Robbie.

■ *The Right to the Parent–Child Relationship*

Plaintiff's other claim in her individual capacity, that the officers' conduct violated plaintiff's right to be free from deprivation of her parent-child relationship by death, without due process of law, is based upon cases from outside this Circuit. Those cases were summarized in the recent Fourth Circuit case of *Rucker v. Harford County,* 946 F.2d 278 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1175, 117 L.Ed.2d 420 (1992). In *Rucker,* a father claimed, in his own behalf, that police conduct which injured his son violated the father's constitutional liberty interest of "intimate association." *Id.* at 282. After not-

ing that this was an issue of first impression in this Circuit, the court summarized the cases from other jurisdictions which recognized such a right. In this summary, the court stated, "Courts recognizing the existence of such a right also differ on its nature, hence on the way it can be violated." *Id.* The court then reserved decision on this issue "for another day." *Id.*

**B. Qualified Immunity**

In the alternative, the defendant officers have asserted that they are entitled to qualified immunity from suit, in their individual capacities, on all of plaintiff's § 1983 claims. This Court's holding *supra* that the defendant officers did not, through their actions, violate a right granted to the plaintiff or Robbie under the Constitution or laws of the federal government would usually be sufficient to dispose of the individual capacity claims. Given the ambiguous and ill-defined nature of the rights claimed by the plaintiff to have been violated, however, this Court feels compelled to address the issue of qualified immunity.

■ The defense of qualified immunity is a judicial attempt to balance the realization that, when government officials abuse their offices, "action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees," with the corresponding fear that subjecting such officials to monetary liability will unduly inhibit officials in the discharge of their duties. *Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982); *see also Mitchell v. Rice,* 954 F.2d 187, 190 (4th Cir.1992). To accommodate these conflicting concerns, the Supreme Court has made qualified immunity available to government officials (federal, state and local) performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitu-

---

**24.** An analogous situation occurred in *Prisco* where the Department of Justice placed a child who was in the custody of her mother and stepfather into the Witness Protection Program without any notification or proceedings to protect the parental rights of the child's father. The Third Circuit held that former Attorney

General William French Smith was not entitled to qualified immunity since two cases from other circuits, with almost identical facts, clearly established that such conduct violated the parent's right to notice and an opportunity to be heard before any such deprivation of parental rights.

tional rights of which a reasonable person would have known." *Id.* 457 U.S. at 818, 102 S.Ct. at 2738. *See, e.g. Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"); *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985) (officials are immune unless "the law clearly proscribed the actions" they took); *See also Hunter v. Bryant,* — U.S. —, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (*per curiam*); *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

Plaintiff, in the present case, contends that the defendant officers are not entitled to qualified immunity for two reasons: 1) low-level police officers, such as defendants, perform only ministerial, not discretionary functions; and 2) even if the officers do perform discretionary functions, their conduct in this case did violate clearly established constitutional rights of both Robbie and the plaintiff.

For the reasons set forth below, the court finds that, in their individual capacities, the defendant officers have met the requirements for qualified immunity announced in *Harlow* and its progeny. The officers, therefore, are entitled to summary judgment in their favor on all claims made by plaintiff in Count I and Count IV.

### *Discretionary Conduct v. Ministerial Conduct*

In *Harlow,* the Supreme Court specifically held that "[g]overnment officials performing discretionary functions, generally are shielded from liability...." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. While the Court limited its grant of qualified immunity to officials performing "discretionary" functions, the Court did not attempt to define exactly what, in the con-

text of official action, constitutes a "discretionary" function. Post–*Harlow* court opinions have shed little light on this question.

In *Westfall v. Erwin,* 484 U.S. 292, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988), a case relied on heavily by the plaintiff in this suit, the Supreme Court ruled that the absolute immunity of federal officials for state law torts did not extend to officials who carry out ministerial tasks. The Court reasoned that the purpose of affording absolute immunity to federal officials is to promote the fearless, independent exercise of discretion unencumbered by the threat of liability. Since this rationale is not present when an official is carrying out a ministerial function, the Court ruled that "absolute immunity from state-law tort actions should be available only when the conduct of federal officials is within the scope of official duties *and* the conduct is discretionary in nature." *Id.* at 297–98, 108 S.Ct. at 584–85 (emphasis in original).

Here, plaintiff contends that *Westfall* supports her argument that, since low-level police officers perform only ministerial functions, they are not entitled to qualified immunity.[25] This argument, however, ignores the fact that all conduct involves *some* discretion and merely begs the question of whether the conduct of the defendant officers was discretionary or ministerial in nature.[26] On this key issue, another post-*Harlow* Supreme Court decision, *Davis v. Scherer,*[27] is more instructive.

In *Davis,* the Supreme Court reversed the holding of the Court of Appeals that the defendant state official was not entitled to summary judgment on qualified immunity grounds. After strongly reaffirming the qualified immunity standard set forth in *Harlow,* the Court, in a footnote, addressed appellee's (plaintiff's) argument that appellant's (defendant official's) viola-

---

**25.** Congress overruled *Westfall* in the Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub.L. No. 100–694. The statute "confers an immunity for all acts (whether discretionary or ministerial) undertaken within the scope of their employment." Hart & Wechsler, *The Federal Courts and the Federal System,* 107 (1989 Supp.).

**26.** In *Westfall,* the Supreme Court specifically declined to "determine the level of discretion required before immunity may attach." 484 U.S. at 299, 108 S.Ct. at 585.

**27.** 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

tion of the personnel regulation in question constituted a breach of a "ministerial" duty established by the regulation. In summarizing the appellee's argument (which sounds much like the argument of plaintiff in the present case), the Court stated:

> Although the decision to discharge an employee clearly is discretionary, appellee reasons that the Highway Patrol regulation deprived appellants of all discretion in determining what procedures were to be followed prior to discharge. Under this view, the *Harlow* standard is inapposite because this Court's doctrine grants qualified immunity to officials in the performance of discretionary, but not ministerial, functions.

*Davis*, 468 U.S. at 196 n. 14, 104 S.Ct. at 3020 n. 14.

In rejecting this argument, the Court noted that the appellee's theory mistook the scope of the "ministerial duty" exception to qualified immunity in two respects. First, the Court noted that the breach of a legal duty created by the personnel regulation would forfeit official immunity only if that breach gave rise to appellee's cause of action for damages. Since appellee made no claim that he was entitled to money damages simply because the regulation was violated, the "ministerial" nat re of the duty created by the regulation was not an issue. Second, and most importantly to the case at hand, the Court stated that the rules that purportedly established appellant's "ministerial" duties left to appellants a substantial measure of discretion. More specifically, the Court stated, "A law that *fails to specify the precise action that the official must take in each instance* creates only discretionary authority; and that authority remains discretionary however egregiously it is abused." *Id.* at 197, 104 S.Ct. at 3021 (emphasis added). The implication of the emphasized statement is clear: there are few, if any, acts performed by

officials which are not discretionary. *See Gagne v. Galveston*, 805 F.2d 558, 560 (5th Cir.1986), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987) ("[T]he Court has never implied that the immunity defense is lost when an official is engaged in routine tasks.").

In the present case, the court has been unable to find, nor has it been cited to a Fourth Circuit case which addresses the issue of what constitutes a discretionary act, much less what constitutes a discretionary act by a police officer. There are, however, a number of Fourth Circuit cases allowing police officers to assert the defense of qualified immunity. *See Gooden v. Howard County*, 954 F.2d 960, 964 (4th Cir.1992) (*en banc*). ("A test of the objective reasonableness of official action has been formulated with the express purpose of according police officers latitude in exercising what are inescapably discretionary functions replete with close judgment calls."); *Tarantino v. Baker*, 825 F.2d 772, 774 (4th Cir.1987) ("The protection of qualified immunity extends to police officers ... providing them with a margin of error when they navigate uncharted areas at the margins of constitutional criminal law."); *Torchinsky v. Siwinski*, 942 F.2d 257 (4th Cir.1991) (holding that police officers entitled to qualified immunity); *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir.1991) ("A police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information *could* have believed his conduct was lawful.") (emphasis in original); *Pachaly v. Lynchburg*, 897 F.2d 723 (4th Cir.1990). These cases, along with the expansive interpretation of "discretionary" conduct set forth by the Supreme Court in *Davis*, lead the court to the inexorable conclusion that the conduct of the officers in this case was discretionary in nature.[28]

---

**28.** The Fifth and Seventh Circuits have granted qualified immunity to police officers for all acts and omissions that occur in the course of their official duties. *See Gagne v. Galveston*, 805 F.2d at 559 ("Police officers are entitled to assert the defense of qualified immunity for all acts and omissions that occur in the course of their official duties."); *Coleman v. Frantz*, 754

F.2d 719, 727 (7th Cir.1985) ("This Court also considers that as a matter of public policy it would be unwise to engage in a case by case determination of § 1983 immunity based upon the ministerial versus the discretionary nature of the particular official act challenged."). While the court is quite satisfied that the acts of the police officers in this case are "discretion-

In this case, Robbie twice presented the police with information concerning drug deals in which he was going to participate. The officers involved chose not to act on Robbie's information the first time he presented it to them. On the second occasion when Robbie supplied the police with information, although the exact circumstances surrounding the decision are not clear, the officers chose to act.[29] While the officers did violate a standing department order by not obtaining plaintiff's written permission to use Robbie as an informant, such violation of a departmental order does not indicate that the decision to use Robbie was "ministerial." *See Davis*, 468 U.S. at 196–97 n. 14, 104 S.Ct. at 3020–21 n. 14. As the Fourth Circuit has stated in a closely related context, "The police must have the ability to move quickly to solve the crime before the evidence becomes stale, a victim/witness dies, or the perpetrator has the chance to repeat the crime. The ability of police officers to protect the public can be severely hampered, however, if their every decision is subject to second-guessing in a lawsuit." *Torchinsky*, 942 F.2d at 261.

In summary, then, the Supreme Court's opinion in *Davis*, the concerns expressed immediately above, and prior grants of qualified immunity to police officers throughout the Fourth Circuit, *see infra*, strongly suggest that the officers' position at the bottom of the Virginia Beach Police Department's hierarchy is of little, if any, importance. What appears to be important, however, is that such officers, low-ranking though they may be, are under an obligation to use the best methods of enforcing the laws and policies of the State of Virginia and the City of Virginia Beach, restricted only by the clearly established rights of citizens of which they should reasonably know.

### Clearly Established Rights

█ Once it has been determined that the defendant officers' conduct was discretionary, the qualified immunity test shields them from liability to the extent their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. at 818, 102 S.Ct. at 2738; *Slattery*, 939 F.2d at 216. The question of the availability of immunity is legal and "ordinarily should be decided by the court long before trial." *Hunter v. Bryant*, —— U.S. ——, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (*per curiam*). Before individually examining each of the deprivations allegedly caused by the defendant officers' conduct in this case, however, a brief review of the standard used to determine whether a right is "clearly established," in the context of qualified immunity, is in order.

The individual who brings suit against a public official bears the burden of clearly establishing the law (and corresponding rights) allegedly violated. *Mitchell v. Rice*, 954 F.2d 187, 190 (4th Cir.1992). A plaintiff who can demonstrate recognition and

ary," the court is persuaded that the Seventh Circuit's elimination of the "ministerial-discretionary" inquiry provides more certain guidance to public officials regarding the scope of the protection afforded them by qualified immunity. It also remedies the perverse notion that high ranking officials with discretionary and policy-making powers (and likely access to counsel) are immune from suit when similar immunity from suit is unavailable to lowly functionaries who have little, if any, choice in carrying out their ministerial functions. *See Morrison v. Lipscomb*, 877 F.2d 463, 468 (6th Cir.1989) (Clerk of court not entitled to qualified immunity since act of implementing judge's order was ministerial in nature).

**29.** Officers Collins and Moyers, with whom Robbie initiated contact on this second occasion, contend that Collins contacted Officer Pickens (with whom Robbie made contact in his first attempt to inform) with regard to the use of Robbie as an informant and that Pickens advised him that it was alright to so use Robbie. Pickens and Batten, on the other hand, claim that they received a radio call to meet Collins and Moyers at a 7–11 to arrest the person that goes to the pay phone and, further, that they had no idea that Robbie would be that person. These factual discrepancies, however intriguing, have little bearing on the question of whether the officers' conduct was ministerial or discretionary in nature. The fact is, a decision was made (by either Collins or Pickens) to use Robbie as an informant. The fact of the choice, not the identity of the chooser, is the focus here.

definition of the scope of a constitutional right by the Supreme Court or the Court of Appeals for the jurisdiction in question (i.e. "controlling precedent") has, for qualified immunity purposes, "clearly established" such right. *See Jensen v. Conrad,* 747 F.2d 185, 194 (4th Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985); *see also Cleveland–Perdue v. Brutsche,* 881 F.2d 427, 431 (7th Cir.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 368, 112 L.Ed.2d 331 (1990). In the absence of controlling precedent in a jurisdiction establishing and defining the breadth of a right, however, there are currently conflicting views as to whether "non-controlling precedents" (i.e. precedents from other jurisdictions), can "clearly establish" a right for qualified immunity purposes.

Courts in the Seventh and Ninth Circuits look to "all available decisional law" to determine whether the right was clearly established at the time of the alleged acts. *Ward v. County of San Diego,* 791 F.2d 1329, 1332 (9th Cir.1986), *cert. denied,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987); *Cleveland–Perdue,* 881 F.2d at 431.

Courts in the Sixth Circuit, on the other hand, confine their inquiry into clearly established rights to

> [B]inding precedent by the Supreme Court, its court of appeals, or itself. In an *extraordinary* case, it may be possible for the decisions of other courts to clearly establish a principle of law. For the decisions of other courts to provide such "clearly established law," these decisions must point *unmistakenly* to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable *direct* authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting (emphasis added).

*Ohio Civil Serv. Employees Ass'n v. Seiter,* 858 F.2d 1171, 1177 (6th Cir.1988); *see also Daugherty v. Campbell,* 935 F.2d 780 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992).

Yet another approach is taken by courts in the Eighth Circuit. The Eighth Circuit has attempted to strike a balance between the two extremes mentioned above. While the "per se" rule followed in the Sixth Circuit was rejected because it would allow officials to claim immunity where "several other circuit, district or state courts had condemned similar practices on the basis of the federal Constitution, so long as a Missouri court, or the District Court for the Eastern District of Missouri or the Eighth Circuit had not yet done so," it is still proper to consider the identity of a court, its geographical proximity, dissemination of information within the pertinent profession and the frequency of similar litigation when determining whether a reasonable official would be aware of the law. *Johnson–El v. Schoemehl,* 878 F.2d 1043, 1049 (8th Cir.1989).

Neither party has cited, nor has the court been able to find through independent research, a Fourth Circuit case addressing the issue of whether, in the absence of controlling precedent establishing and defining a right, such a right can be clearly established by decisions from courts outside the Fourth Circuit. After careful consideration, the court finds that the Eighth Circuit's approach, as discussed above, provides the best balance of the competing interests at stake.[30]

Such an approach does not let public officials evade liability in situations where other courts have condemned practices similar to those complained of merely because it is an issue of first impression in the Fourth Circuit. Nor does this approach hold public officials responsible for knowledge of an isolated state or federal court decision. In essence, this approach allows a trial court to use its common sense by considering the likelihood that a certain decision[s] has been so widely disseminated that a reasonable official would be aware of the law.

### Claims Against Individual Defendants

Assuming for the purposes of this analysis that the rights claimed by Robbie were,

---

**30.** The court notes that the difficulty it encountered in trying to ascertain the Fourth Circuit's position on this issue illustrates how difficult it is for public officials who are unskilled in the science of law to determine the state of the law at any given time.

in fact, contemplated by the United States Constitution, it follows from the discussion, *supra,* of the asserted origins of those rights that, at the time of the events preceding the death of Robbie Williamson, none of those rights were so clearly established as to deprive any of the individual defendants of the defense of qualified immunity.

■ *The Special Relationship Analysis*

■ Assuming that Robbie Williamson was entitled by the Constitution to an affirmative duty of care by the officers in question, that duty was not so clearly established as to divest the officers of their qualified immunity. The United States Supreme Court heard argument in *DeShaney v. Winnebago County Department of Social Services* [31] on November 2, 1988, three days before Robbie's first phone call to the Virginia Beach Police. It rendered its decision in February 1989. The Court stated that it granted *certiorari* in *DeShaney* "[b]ecause of the inconsistent approaches taken by the lower courts in determining when, if ever, the failure of a state or local governmental entity or its agents to provide an individual with adequate protective services constitutes a violation of the individual's due process rights, and the importance of the issue to the administration of state and local governments." 489 U.S. at 194, 109 S.Ct. at 1002. Such a statement by the Supreme Court indicates that the right to an affirmative duty to protection was anything but "clearly established." Thus, the officers are entitled to qualified immunity on this claim.

■ *The Right to Parental Care and Guidance*

■ Were this Court to find that the asserted right to parental care and guidance was implicated by the circumstances presented, the plaintiff has failed to show

that this right was "clearly established" for qualified immunity purposes in the Fourth Circuit. *Duchesne v. Sugarman* [32] was decided by the Second Circuit in 1977. It has not been cited in the Fourth Circuit for the proposition that a constitutional right to the benefit of a family bond exists. Additionally, plaintiff's failure to cite any authority other than *Duchesne* for this proposition leads this court to the conclusion that plaintiff has failed to show that this right was "clearly. established." [33]

■ *The Right to Physical and Emotional Integrity*

■ The claimed right of Robbie Williamson to physical and emotional integrity was not "clearly established" in the Fourth Circuit for the purposes of qualified immunity. Not only was *White* decided by a court a great geographic distance from the Fourth Circuit, but it never has been cited in a reported opinion in this circuit. Additionally, the contours of the rights set forth in *White* are, to say the least, somewhat vague. *"Harlow's* 'clearly established' standard demands that a bright line be crossed." *Gooden,* at 967 (*quoting Barts v. Joyner,* 865 F.2d 1187, 1194 (11th Cir. 1989)). When the unique and egregious factual circumstances in *White* are compared to the facts of the instant case (especially the fact that Robbie's mother was told of his activities and related fears prior to his death), it is not the case that the "right was ... sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful." *Gooden,* at 967 (*quoting Azeez v. Fairman,* 795 F.2d 1296, 1301 (7th Cir.1986)).[34]

*[4] The Plaintiff's Right to the Care, Custody and Management of her Child*

■ Even if, *arguendo,* a violation of plaintiff's right to the care, custody and

---

**31.** 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

**32.** 566 F.2d 817 (2d Cir.1977).

**33.** Alternatively, the court also finds that the right to the benefit of a family bond with a parent is not, in this case, sufficiently particularized that a potential defendant (e.g. the de-

fendant officers) would be on notice that their conduct probably is unlawful. *See Gooden,* 954 F.2d at 970.

**34.** Plaintiff's argument at pages 3 through 5 of her Brief in Opposition to Defendant's Second Motion for Summary Judgment is inapposite. The conduct complained of in the present case is in no way analogous to that complained of in

management of Robbie occurred, such law was not so clearly established that reasonable officers should have known of it. This conclusion is inescapable upon examining the situations in which a violation of this right was recognized, *see supra;* application of this right to the conduct complained of in this case would be a rather substantial leap. As stated in *Swanson v. Powers,* 937 F.2d 965, 969 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 871, 116 L.Ed.2d 777 (1992),

> [W]e note that in determining whether the law is clearly established, the vintage of the asserted right is of less guidance than the specificity of the right ... [t]he greater the similarity of existing case law to the situation at hand, the greater its guidance to the reasonable state official.

Here, the precedents provide little guidance; accordingly, this right was not clearly established in the Fourth Circuit for qualified immunity purposes.

### ▪ *The Right to the Parent–Child Relationship*

▪ Finally, given the Fourth Circuit's opinion that this right has a differing nature and means of violation, *Rucker,* 946 F.2d at 282, it is not the case that such a right is so clearly established as to alert a reasonable officer to its scope. *See Gooden,* at 967; *Swanson,* 937 F.2d at 969. While it is true that this right may one day be recognized by the Fourth Circuit, it is not the responsibility of a police officer to predict the future course of decisions of federal appellate courts. The officers, therefore, are entitled to qualified immunity on this claim.

### C. *Claims Against Municipal Defendants*

▪ Counts 2 and 3 of plaintiff's Amended Complaint attempt to allege "a municipal practice maintained with deliberate indifference to its consequences, including inadequate training which resulted in the death of Robbie." (Pl.Br. in Opp. To Def.2d Mot. for Summ.J. at 6). As previously stated, Counts II and III also encompass the claims against the various defendants in their official capacity.

The Fourth Circuit, and more recently the United States Supreme Court, have made clear, however, that there can be no municipal liability where the plaintiff's harm was not caused by a constitutional violation. *See, e.g., Collins v. City of Harker Heights,* —— U.S. ——, ——, 112 S.Ct. 1061, 1065, 117 L.Ed.2d 261 (1992); *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986); *Monell v. Dep't of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Temkin,* 945 F.2d at 724; *Belcher,* 898 F.2d at 36. In the absence of any constitutional violation, therefore, defendants' Motion for Summary Judgment must be granted.

▪ Even in the event this Court were to rely solely on the alternative holding that the officers in question are entitled to qualified immunity on plaintiff's claims because she does not allege the violation of a clearly established constitutional right, the municipal defendants would be entitled to summary judgment. In order to be held liable on a claim that a municipal government policy of failure to train resulted in constitutional harm,[35] a plaintiff must show that the policy or custom was the "moving force" behind the constitutional violation. *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981). The causal link necessary to support a policy of inadequate training claim is demonstrated by showing that the failure to train amounts to "deliberate indifference to the rights of persons with whom the police come in contact." *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). Assuming that the constitutional rights alleged by plaintiff did

---

*Temkin v. Frederick County Commissioners,* 945 F.2d 716 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992). More importantly, however, *Temkin* was an appeal from a grant of summary judgment on the

merits, not an appeal of an grant of qualified immunity.

**35.** Assuming, for these purposes, that a constitutional violation has in fact occurred.

exist, the conclusion that they were not clearly established negates the proposition that the city acted with deliberate indifference. "To be 'deliberately indifferent' to rights requires that these rights be clearly established." *Watson v. Sexton*, 755 F.Supp. 583, 588 (S.D.N.Y.1991). Thus, the alternative finding of qualified immunity does not in any way undermine the granting of summary judgment to the defendants on the issue of municipal liability.

### D. The Virginia Wrongful Death Claim

The remaining claim, Count V, is brought under the Virginia Death By Wrongful Act statute. The ground for defendants' motion for summary judgment is that suicide is an unlawful and immoral act which bars a wrongful death claim. Defendants argue that suicide is a common law crime in Virginia punishable by forfeiture of estate. Although the General Assembly of Virginia has abolished the penalty for suicide by enacting Va.Code § 55–4 [36], they argue that the act was not decriminalized. Moreover, they argue, suicide is lacking in morality, for which they cite *Plunkett v. Supreme Conclave*, 105 Va. 633, 55 S.E. 9 (1906), (the act of taking one's life is "subversive of sound morality").

In *Miller v. Bennett*, 190 Va. 162, 56 S.E.2d 217 (1949), the Supreme Court of Virginia held that a wrongful death action against one who committed an abortion or an attempted abortion was barred, because "a party who consents to and participates in an immoral or illegal act cannot recover damages from other participants for the consequence of that act." *Id.* 56 S.E.2d at 218.

Likewise, in *Zysk v. Zysk*, 387 S.E.2d 466, (Va.) *corrected op.*, 239 Va. 32, 404 S.E.2d 721 (1990), the Supreme Court of Virginia held that a person who contracted a disease as a result of sexual intercourse with another to whom she was not married cannot recover from the other because together they participated in the illegal act of fornication.

Defendants also cite *Hill v. Nicodemus*, 755 F.Supp. 692 (W.D.Va.1991). *Hill* is similar to this case in that it was brought under 42 U.S.C. § 1983, with a pendent claim under the Virginia Death By Wrongful Act statute. Plaintiff's decedent was being held for pretrial detention in the jail serving Winchester, Virginia. On the day of admission, she committed suicide.[37] The court dismissed the wrongful death claim on the ground advanced by defendants in this case.

Plaintiff's argument that suicide is not a bar to a wrongful death claim is multifaceted. Plaintiff contends i) that the concluding portion of Va.Code § 8.01–50 ("[a cause of action exists], although the death shall have been caused under such circumstances, as amount in law to a felony"), "is an unambiguous statement of intent to cast aside common-law based" defenses, such as suicide; ii) that because the wrongful death statute is in derogation of the common law, "a judicially carved bar to a remedy under the Act based on decedent's suicide is a clear contravention of modern legislative intent"; iii) there is a "modern trend" to allow recovery based on suicide if negligence, foreseeability and proximate cause are established; iv) that *Hewitt v. Virginia Health Services Corporation*, 391 S.E.2d 59 (Va.1990) and *White v. United States*, 359 F.2d 989 (4th Cir.1966), both involving suicides in Virginia, were decided without reference to a suicide defense, thus evincing a recognition that the defense is not viable; v) that *Hill v. Nicodemus, supra,* was wrongly decided, because *Miller v. Bennett, supra,* and *Zysk v. Zysk, supra,* were distinguishable; vi) that suicide is not a crime in Virginia; vii) that plaintiff's decedent, a 17 year old infant, was not of

---

**36.** "No suicide ... shall work a ... forfeiture of estate."

**37.** In the appeal to the Fourth Circuit, it is contended that Tanya Hill was insane; that she was "unable to resist the desire to commit suicide." Appellant's Brief, *Hill v. Nicodemus*, No. 91–1634, p. 18. In the case at bar, there is no

evidence that Robbie Williamson was insane. His psychiatrist, Dr. Darby, opined that he had perceived the threats against his mother because of the stress place upon him by his position as an informant, and that he reasoned that the best protection for his mother would be his death.

an age of discretion, a requirement for the common law crime of suicide; and viii) being a juvenile, the offense of suicide would have been treated as an act of delinquency, not as a crime.

Plaintiff also cites *Greene v. Guarino*, Law No. 99842, letter op. (Va.Cir.Ct. Sept. 6, 1991). In that case, the court held that in a case of alleged medical malpractice, suicide is not a bar as a matter of law. The court held that if suicide is a bar it would be so only upon "application of traditional tort law analysis" of negligence, foreseeability and causation. The court reasoned: "[T]he cause of action as pled[ ] does not arise from nor is it based on the allegedly immoral illegal act of suicide. Rather it is based on the defendant's alleged failure to exercise the requisite care under the circumstances of this case, resulting in the self-inflicted death of plaintiff's decedent."

It is the opinion of the Court that *Hill v. Nicodemus* and *Greene v. Guarino*, can not be reconciled. Both cases advance a reasoned view of what the law in Virginia is. The former decision is based upon an analysis of existing Virginia precedent by a United States district judge; the latter decision is based more upon an analysis of the evolution of state law beyond decided Virginia cases on the mark by a state circuit court judge. Both are persuasive authority.

Following the counsel of *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law", the Court will exercise its discretion by dismissing without prejudice the pendent state wrongful death claim. *Fox v. Custis*, 712 F.2d 84, 89–90 (4th Cir. 1983) (after resolving the § 1983 claim, "the case was reduced to difficult and open questions of state law that were best resolved in the first instance by the Virginia courts." (footnote omitted.))

**38.** Rule of Court 4:7(e) and Va.Code § 8.01–420.

The Court is mindful that considerable expenditure of time and expense has been devoted to this case and that a dismissal without prejudice will result in the filing of a new action in the state court. However, there is little likelihood that additional discovery will be required or that additional evidence will be developed. Moreover, defendant's suicide defense can be raised by a demurrer without the impediment of Virginia's Rule of Court and statute prohibiting the use of depositions in support of a motion for summary judgment.[38] If the demurrer is overruled, the parties will probably be ready for trial.

The Court is also mindful that this action was filed the day before the statute of limitations would have tolled it. Therefore, in accordance with the request of plaintiff's counsel, the Court will delay the entry of a final order in this case to give counsel an opportunity to advise the Court how plaintiff wishes to proceed to protect the state claim. Plaintiff's counsel should advise the Court with reasonable promptness, at most within the next fourteen (14) days, as to his wishes in this regard.

## CONCLUSION

For the reasons set out above, defendants' Motion for Summary Judgment will be granted with respect to Counts I through IV. Count V will be dismissed without prejudice to plaintiff's right to bring her state law claims in the Virginia courts. A final order will be entered in accordance with this Opinion after the Court is advised by plaintiff's counsel how he wishes to proceed to protect the state claim.